UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
**Charlottesville Division**

| | |
|---|---|
| **WILD VIRGINIA, et al.** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | Case No. 3:25-cv-0100 |
| ) | |
| **VIRGINIA DEPARTMENT OF** ) | |
| **ENVIRONMENTAL QUALITY, et al.** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS PURSUANT TO RULE 12(b)(1)**

The Virgina Department of Environmental Quality and Michael Rolband, in his official capacity (collectively "DEQ"), by counsel, file this memorandum in support of the Motion to Dismiss Pursuant to Rule 12(b)(1) filed this day.

**I.     INTRODUCTION**

Wild Virginia and the Potomac Riverkeeper Network ("PRKN") (collectively "Plaintiffs") seek to challenge a stormwater permit (the "Permit") issued by DEQ to the United States Department of the Army's (the "Army") Fort Belvoir facility. The Plaintiffs' primary complaint is that the Permit "does not include any effluent limitations on, or even monitoring of, industrial stormwater discharges containing per- and polyfluoroalkyl substances ("PFAS") into federal or state waters." Pet. at 1 (ECF 1, Ex. B). The Plaintiffs, however, lack standing to bring this claim.

The Plaintiffs may assert associational standing if a member's alleged harm is sufficient to establish standing, but none of the individuals referenced in the Petition for Appeal state a sufficiently immediate or concrete harm to meet this burden. Rather, the Plaintiffs express no

more than vague "worries" and "concerns" about the potential impact that PFAS that may emanate from Fort Belvoir in the future will have on their health or the environment. These worries or concerns, however, are not tied to any violation of law or level of exposure.

In addition to lacking standing, the plaintiffs' claims are barred by sovereign immunity. The Virginia Administrative Process Act ("VAPA") constitutes a limited waiver of sovereign immunity, and "the Commonwealth also may tailor its consent to be sued by prescribing certain modes, terms, and conditions." *Virginia Bd. of Med. v. Virginia Physical Therapy Ass'n*, 13 Va. App. 458, 465 (1991). The Commonwealth has not consented to suit in a federal district court, and the plaintiffs' claims should be dismissed.

## II.    PROCEDURAL HISTORY

On October 1, 2025, DEQ reissued Virginia Pollutant Discharge Elimination System ("VPDES") Permit No. VA0092771 (the "Permit") to the U.S. Army Garrison – Fort Belvoir in Fairfax County. Compl. ¶ 88. Prior to issuing the Permit, the public had two opportunities to provide comments, DEQ held two public hearings, and DEQ responded to public comments. *Id.* ¶¶ 81-87.

On October 31, 2025, the Appellants timely filed a Notice of Appeal with DEQ and subsequently filed a timely petition for appeal to the Virginia Circuit Court for the City of Charlotteville City on December 1, 2025. The United States Department of the Army (the "Army") subsequently removed the state matter to this Court on December 19, 2025, pursuant to 28 U.S.C. §§ 1442(a) and 1446(a).

### III.  RELEVANT FACTUAL BACKGROUND

#### a. Fort Belvoir

The Army began using the Belvoir peninsula in 1915 for training engineers and the site was christened Camp Humphreys in 1917. U.S. Army Fort Belvoir – History, The Modern Era https://home.army.mil/belvoir/about/history That Camp grew to over 6,000 acres by 1919 and was renamed Fort Belvoir in 1935. During World War II, the Fort was used for training military engineers and additional land was added. After WWII, Fort Belvoir was used for testing and developing engineering equipment and remained the home of the Engineer School until 1988. It remains in use as a strategic sustaining base. *Id.*

#### b. History and uses of PFAS

"PFAS have been manufactured and used in various industrial applications in the United States and around the globe since the 1940s." Nat'l Pollutant Discharge Elimination Sys. (NPDES) Multi-Sector Gen. Permit for Stormwater Discharges associated with Industrial Activity – Fact Sheet. www.epa.gov/system/files/documents/2024-12/proposed-2026-msgp-fact-sheet.pdf at 58. PFAS have been used in a wide range of industrial and consumer products with common uses, including the following applications:

| | |
|---|---|
| Adhesives | Plastic and rubber manufacturing |
| Cleaning products | Textile manufacturing |
| Computers/electronics | Aerospace manufacturing |
| Film/lithography | Automotive manufacturing |
| Metal plating | Construction material manufacturing |
| Oil and gas drilling | Mining |
| Paint manufacturing | Medical products |
| Paper manufacturing | Cosmetic manufacturing |
| Pesticide/Fertilizer manufacturing | Fire suppression systems |

Interim Guidance on the Destruction of Perfluoroalkyl and Polyfluoroalkyl Substances and Materials Containing Perfluoroalkyl and Polyfluoroalkyl Substances— Version 2 (2024), Pet. ¶ 54 at 18-23.

### c. Factual allegations raised by plaintiffs and their members

The plaintiffs seek to establish standing through certain members of their respective organizations and on their own behalf. Petition for Appeal ("Pet.") ¶¶ 10, 27. Wild Virginia alleges that it is involved in advocacy to protect water quality, particularly regarding PFAS in water, involving regulatory actions and legislation. *Id.* ¶ 2.

Wild Virginia also seeks to establish standing through two of its members, Nancy Armour and George Semanov. Nancy Armour and her husband, own a house on the Potomac River in Montross, Virginia where she enjoys boating, fishing, swimming, and crabbing. She also eats seafood from the Potomac River but limits how much she eats because of concerns of long-term effects of PFAS. Petition for Appeal ("Pet.") ¶ 5. Montross is approximately 45 miles from Fort Belvoir.

Mrs. Armour also has a residence in Woodbridge, Virginia, and the source of the drinking water for that residence is the Occoquan Reservoir, which she understands may be contaminated with PFAS. *Id.* ¶ 7. She does not allege that any PFAS in the Occoquan Reservoir originated at Fort Belvoir.

Mrs. Armour claims that she will "recover the same level of enjoyment she used to have spending time on and eating food from the Potomac River" if monitoring and limits on PFAS discharges are included in the Permit. *Id.* ¶ 8.

George Semanov lives in Falls Church, Virginia and often kayaks on the Potomac River between Alexandria and Westmoreland County. *Id.* ¶ 9. Mr. Semanov raises two concerns about Fort Belvoir's alleged discharge of PFAS into the Potomac River. First, he worries about PFAS

4

discharges into the Potomac River because his family's drinking water comes from that river. *Id*. The drinking water that is drawn from the Potomac River and used by Falls Church, however, is taken upriver from Fort Belvoir at the James J. Corbalis Jr. treatment plant and/or the Washington Aqueduct. https://www.fairfaxcounty.gov/soil-water-conservation/where-does-drinking-water-come-from-fairfax-county Second, Mr. Semanov claims that he is concerned about ingesting water while kayaking in the Potomac River. *Id*.

Mr. Semanov claims that he will "worry less about his drinking water being contaminated and would again enjoy kayaking" if monitoring and limits on PFAS discharges are included in the Permit. *Id*.

PRKN alleges that it undertakes various activities, including monitoring and investigating sources of PFAS in the Potomac and Shenandoah watersheds.[1] *Id.* ¶ 11. PKRN attempts to address those issues through advocacy and litigation. *Id.* PKRN also seeks to establish standing through three of its members, Dean Naujoks, Camilla Ng, and Larry Zaragoza.

Dean Naujoks serves as the Potomac Riverkeeper. *Id*. ¶ 14. In this role he investigates pollution reports, conducts investigations, participates in advocacy, and coordinates staff and volunteers. Mr. Naujoks also directs certain water quality monitoring, including in the Pohick Bay which is adjacent to Fort Belvoir. If Fort Belvoir is required to monitor discharges, he can divert his resources to other activities. *Id*. ¶ 15

Camilla Ng is a member of PRKN who claims to frequently paddle board and kayak in waters downstream and adjacent to Fort Belvoir. She enjoys the wildlife in this area and is concerned that Fort Belvoir will harm the ecosystem. *Id*. ¶ 17. Her enjoyment of the area is lessened because she is concerned about ingesting the water if she falls and she is concerned

---

[1] Potomac Riverkeeper Network is not registered with the Virginia State Corporation Commission to transact business in Virginia as a business entity or as a fictitious name.

5

about consuming seafood from that area. *Id.* ¶ 18. If the plaintiffs' appeal is successful and DEQ requires PFAS limitations, she will once again enjoy recreating in the waters surrounding Fort Belvoir. *Id.* ¶19.

Larry Zaragoza is a member of PRKN who claims to bird watch and paddle in waters adjacent to Fort Belvoir. *Id.* ¶ 20, 22. He is concerned about contact and/or ingestion of water containing PFAS and avoids eating locally caught seafood. *Id.* ¶ 22, 24. If this appeal is successful, Mr. Zaragoza's harms "will be at least somewhat alleviated." *Id.* ¶ 26.

### d. Allegations of PFAS Discharges

Throughout their Petition, the plaintiffs allege that it is "likely" that discharges from Fort Belvoir contain PFAS. Pet. ¶ 62 ("more likely than not that stormwater discharges contain PFAS"); 68 ("these outfalls most likely discharge PFAS at detectable levels"); 82 ("PFAS contamination . . . will likely result in discharges of PFAS"). The plaintiffs do not allege the concentration or types of any PFAS that may be discharged from Fort Belvoir.

### IV. STANDARD OF REVIEW

The plaintiff bears the burden of proving subject matter jurisdiction in response to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). *Piney Run Pres. Ass'n v. Cnty. Comm'rs*, 523 F.3d 453, 459 (4th Cir. 2008) (citation omitted). This is because "[i]t is to be presumed that a cause lies outside th[e] limited jurisdiction" of the federal courts. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citation omitted).

"[W]hen a defendant challenges subject matter jurisdiction via a Rule 12(b)(1) motion to dismiss, the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Mowery v. Nat'l Geospatial-Intelligence Agency*, 42 F.4th 428, 433 (4th Cir. 2022) (citation modified). A "court may … 'consider official public records, documents central to

6

plaintiff's claim, and documents sufficiently referred to in the complaint' without converting a motion to dismiss into one for summary judgment, 'so long as the authenticity of these documents is not disputed.'" *Arnold v. Capital One Servs.*, No. 3:10-CV-244, 2011 U.S. Dist. LEXIS 24200, at *4–5 (E.D. Va. Mar. 10, 2011) (quoting *Witthohn v. Fed. Ins. Co.*, 164 Fed. App'x 395, 396 (4th Cir. 2006)).

V.   ARGUMENT

   a.  The Plaintiffs lack Standing.

A litigant must have legal standing under Article III of the Constitution to maintain a lawsuit in federal court. *See Benham v. City of Charlotte*, 635 F.3d 129, 134 (4th Cir. 2011). Standing is an "irreducible constitutional minimum" that must be satisfied in all cases. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

At the outset, DEQ agrees that the plaintiffs may establish representational standing under *Hunt v. WA State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977), if they can show: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *See also Philip Morris USA, Inc. v. Chesapeake Bay Found., Inc.*, 273 Va. 564, 577 (4th Cir. 2007). But the plaintiffs cannot establish the first element.

To establish standing in their own right, the individuals must show an injury that is: (1) concrete, particularized, and actual or imminent; (2) fairly traceable to the challenged action by the defendant; (3) likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61. Moreover, each individual "must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439

7

(2017) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)).  The plaintiffs cannot establish any of these three factors.

The plaintiffs cannot meet the first *Lujan* prong because they have not alleged a "concrete" injury that is actual or imminent. The plaintiffs do not allege definitively that stormwater discharges from Fort Belvoir contain PFAS. *Supra* at __. Similarly, they acknowledge that "PFAS persist in the environment," making it difficult to determine the source of existing PFAS in the environment. Pet. ¶64. The plaintiffs also admit that there are no numeric concentration limitations for PFAS in stormwater discharges that any applicable regulatory body has required.[2] *Id.* ¶51, 105. In sum, the plaintiff cannot say that any regulatory standard was breached, or that any existing PFAS in waters near Fort Belvoir emanated from that fort, and they cannot even say that any PFAS are currently being discharged from Fort Belvoir.

The plaintiffs have failed to allege a concrete injury that stems from issuing the Permit. A "concrete" injury must be "*de facto*"; that is, it must actually exist. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). Here, the plaintiffs have not alleged any injury that does not arise from the status quo ante. They have not demonstrated that any existing PFAS in the Potomac River were discharged by Fort Belvoir. Nor can they say that Fort Belvoir is currently or will in the future discharge stormwater containing PFAS.

Similarly, any alleged injuries are not "fairly traceable" to the issuance of the Permit. The "fairly traceable" requirement ensures that there is a genuine nexus between a plaintiff's injury and a defendant's alleged illegal conduct. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000) (citing *Lujan*, 504 U.S. at 560). As noted

---

[2] The plaintiffs cite to *drinking* water standards promulgated by EPA. Pet. ¶72.  The plaintiffs do not explain how these standards relate to stormwater discharge limits. Moreover, those standards do not become effective until 2029, and EPA has announced that it will likely extend that deadline until 2031. https://www.epa.gov/newsreleases/epa-announces-it-will-keep-maximum-contaminant-levels-pfoa-pfos

above, the plaintiffs here complain about *existing* alleged pollution in the waters surrounding Fort Belvoir. There is simply no nexus at all between issuing the Permit and the plaintiffs' alleged injury.

The plaintiffs' allegations do not describe injuries arising from DEQ actions in issuing the Permit. Rather, they describe injuries incurred because of past actions. Every member of Wild Virginia and PRKN described concerns that predate the issuance of the Permit. Put another way, the plaintiffs are not complaining they have been injured by DEQ's issuance of the Permit, they are complaining that by issuing the Permit, DEQ has not fixed an existing problem. Temporally, the plaintiffs' claims look backward and do not support standing. *Beck v. McDonald*, 848 F.3d 262, 271 (4th Cir. 2017) ("an injury-in-fact must be concrete in both a qualitative and temporal sense") (cleaned up).

The plaintiffs cannot show that an order of this Court would redress their alleged injuries. Redressability turns not merely the relief requested, but on whether that relief will remedy the alleged injury. "An injury is redressable if it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)).

The only "injury" that Mrs. Armour alleges is that she eats less fish from the Potomac River.[3] The Complaint does not provide any facts showing that her concerns are reasonable. Namely, she does not allege that she regularly consumes fish that could be caught in areas near or downstream from Fort Belvoir. Likewise, given the pervasive and persistent presence of

---

[3] Ms. Armour mentions swimming in the Potomac River, but the Petition never indicates that PFAS impact swimming safety. Indeed, EPA advises that "[s]tudies have shown that only a small amount of PFAS can get into your body through your skin." https://www.epa.gov/pfas/meaningful-and-achievable-steps-you-can-take-reduce-your-risk

9

PFAS in the environment regardless of Fort Belvoir's activities, and the lack of any data showing PFAS discharges from Fort Belvoir, any such concerns are not "fairly traceable" to DEQ's action in granting the Permit a few months ago. Which then leads to the inherent problem raised by the third *Lujan* element, redressability. According to the plaintiff, PFAS are forever chemicals. Thus, the amount of PFAS in the water that led Mrs. Armour to consume fewer fish from the Potomac will not likely change. Her conclusory allegation that she will "recover the same level of enjoyment" if monitoring and discharge limits are imposed Fort Belvoir is not plausible.

Wild Virginia's other member, Mr. Semanov, alleges two harms: 1) concern over drinking water at his home, and 2) concern over accidentally swallowing water if he falls in while kayaking. His first concern is not well-taken because his family's drinking water is drawn from the Potomac River far upstream from Fort Belvoir. His second concern is too speculative to constitute the concrete harm required to establish Article III standing. And like Mrs. Armour, his claim that PFAS discharge limits at Fort Belvoir would allow him to "again enjoy kayaking" is not plausible. The "forever" chemicals will still be present irrespective of whether discharge limits are imposed upon Fort Belvoir. In sum, both of Wild Virginia's members have failed to establish standing separately, meaning that Wild Virginia fails to establish representational standing. Wild Virginia's claims against DEQ should be dismissed.

PRKN seeks standing because of alleged injuries to Camilla Ng and Larry Zaragoza. Just like Mrs. Armour and Mr. Semanov, Ms. Ng and Mr. Zaragoza have concerns about seafood from the Potomac. Their concerns likewise suffer from the same problems of traceability, redressability, and plausibility. Ms. Ng, like Mr. Semanov, is concerned about swallowing water containing PFAS, but has failed to show that this eventuality is anything beyond "'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560, (quoting *Whitmore* v. *Arkansas*, 495 U.S. 149, 155, 109 L. Ed. 2d 135, 110 S. Ct. 1717 (1990)). It fails to meet the "actual or imminent" standard

10

that would establish Article III standing. In sum, none of the individuals presented by the plaintiffs have shown standing.

### b. The Plaintiffs' claims are barred by sovereign immunity in this Court.

The Virginia Administrative Procedure Act contemplates the review of Virginia state administrative actions by Virginia Courts. This case is anomalous in that an agency of the United States is the putative permittee and is required by Virginia law to be a party to this administrative appeal. Va.R.Civ.Proc. Rule 2A:1(c). But the fact that a federal agency is a required party does not override the fact that the Commonwealth retains its sovereign immunity here.

In their Petition, the plaintiffs correctly cite Virginia Code § 62.1-44.29 as the basis for requesting judicial review of an administrative case decision. Pet. ¶34. That code section provides that a person who has participated in the public comment process related to a DEQ case decision

> is entitled to judicial review thereof in accordance with the provisions of the Administrative Process Act (§ 2.2-4000 et seq.) *if such person meets the standard for obtaining judicial review of a case or controversy pursuant to Article III of the United States Constitution*. A person shall be deemed to meet such standard if (i) such person has suffered an actual or imminent injury which is an invasion of a legally protected interest and which is concrete and particularized; (ii) such injury is fairly traceable to the decision of the Board and not the result of the independent action of some third party not before the court; and (iii) such injury will likely be redressed by a favorable decision by the court.

(emphasis added). As discussed above, plaintiffs here have failed to establish Article III standing. Clearly, the General Assembly, in codifying the elements of standing embraced by *Lujan* and its progeny, was indicating its intent to waive the Commonwealth's sovereign immunity only under a very specific set of circumstances: when the complaining party has (1) followed the procedure set forth by VAPA and (2) established Article III standing. Plaintiffs' failure to meet the second prong means they are no longer covered under the limited waiver of sovereign immunity.

What is more, Code § 62.1-44.29 is contained in Article 5, "Enforcement and Appeal Procedure," Chapter 3.1 of the State Water Control Law. The next and final statute in that chapter, Virginia Code § 62.1-44.30, succinctly states that "[f]rom the final decision of the *circuit court* an appeal may be taken to the Court of Appeals as provided in § 17.1-405." (emphasis added). Quite obviously, the Virginia state legislature assumed that only Virginia circuit courts would hear appeals from administrative agencies.

This point is further underscored by other relevant Virginia laws and regulations. Virginia Code § 2.2-4026(A) provides that any:

> party aggrieved by and claiming unlawfulness of a case decision . . . shall have a right to the direct review thereof by an appropriate and timely court action against the agency or its officers or agents in the manner provided by the Rules of Supreme Court of Virginia.

In keeping with this legislative directive, the Supreme Court of Virginia promulgated Part Two A, "Appeals Pursuant to the Administrative Process Act," which provides the procedure by which the aggrieved party may obtain judicial review. This statutory directive was based upon Article VI., Section 5 of the Constitution of Virginia which states that:

> [t]he Supreme Court shall have the authority to make rules governing the course of appeals and the practice and procedures to be used in the courts of the Commonwealth.

The Virginia Constitution does not bestow upon the Supreme Court of Virginia any authority to promulgate rules of general applicability to non-Virginia courts.

In a similar vein, another federal district court in Virginia has reached the conclusion that the VAPA does not "authorize[s] federal judicial review" of state administrative agency decisions. *Dr. Michael Fernandez, D.D.S., Ltd. v. Brich*, 2024 U.S. Dist. LEXIS 111043, *21 (E.D. Va. June 20, 2024). While a slightly different point, *Fernandez* compels the same result and this Court should dismiss this case.

12

WHEREFORE, for the foregoing reasons, the Virgina Department of Environmental Quality and Michael Rolband request that this Court dismiss the plaintiffs' Petition.

        Respectfully submitted,

        Virginia Department of Environmental Quality and Michael Rolband

        By Counsel:  /s/ John D. Gilbody
        John D. Gilbody* (VSB No. 42788)
        Senior Assistant Attorney General
        Office of the Virginia Attorney General
        202 North 9th Street
        Richmond, Virginia 23219
        Telephone:   (804) 786-4319
        Email: jgilbody@oag.state.va.us

Jason S. Miyares
Attorney General of Virginia

Steven G. Popps
Deputy Attorney General

John D. Gilbody* (VSB No. 42788)
Senior Assistant Attorney General
Office of the Virginia Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone:   (804) 786-4319
Email: jgilbody@oag.state.va.us
*Counsel of Record for the Virginia Department of Environmental Quality and Michael Rolband

## CERTIFICATE OF SERVICE

I hereby certify that on January 14, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

/s/ John D. Gilbody
John D. Gilbody* (VSB No. 42788)
Senior Assistant Attorney General
Office of the Virginia Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone:     (804) 786-4319
Email: jgilbody@oag.state.va.us