IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| WILD VIRGINIA, et al., | ) |
|     Plaintiffs, | ) ) ) |
| v. | ) ) Case No. 3:25-cv-0100 |
| VIRGINIA DEPARTMENT OF ENVIRONMENTAL QUALITY, et al., | ) ) ) ) |
|     Defendants. | ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF
THE UNITED STATES' MOTION TO DISMISS**

Defendant the United States respectfully submits this memorandum of law in support of its Motion to Dismiss based on Plaintiffs' lack of standing.

**INTRODUCTION**

On October 1, 2025, the Virginia Department of Environmental Quality ("VADEQ") issued a stormwater discharge permit to U.S. Army Garrison, Fort Belvoir, a military installation situated in Fairfax County, Virginia, pursuant to the Clean Water Act (33 U.S.C. §§ 1251-1387) and the Virginia State Water Control Law (Va. Code Ann. §§ 62.1-44.2 *et seq.*). The permit allows the Army to release rain and other surface water into nearby streams and rivers that ultimately lead to the Potomac River Basin. This case stems from the issuance of that permit.

Plaintiffs Wild Virginia and Potomac Riverkeeper Network ("Riverkeeper") contend VADEQ violated the Virginia Administrative Process Act ("Virginia APA") because the permit does not contain effluent[1] limitations or a monitoring requirement for per- and polyfluoroalkyl

---

[1] "Effluent" refers to "chemical, physical, biological, and other constituents which are discharged from *point sources* into navigable waters, the waters of the contiguous zone, or the ocean." 33 U.S.C. § 1362(11) (emphasis added). A "point source" is a "discernible, confined and discrete

1

substances ("PFAS").[2] ECF No. 1, Ex. B, Petition for Appeal ("Pet.") at 2. The Court should dismiss this case because Plaintiffs have not established organizational or representational standing.[3]

Wild Virginia and Riverkeeper assert organizational and representational standing based on their respective members' use of Accotink Creek, the Potomac River, and surrounding tributaries and wetlands. Pet. ¶¶ 4, 10, 27. The alleged injuries with respect to individually identified members of both Riverkeeper and Wild Virginia can be generally summarized as: impacts to recreational activities, such as kayaking and fishing; effects on aesthetics, such as losing the ability to observe wildlife; and health concerns, to include consuming food from the area around Fort Belvoir and contamination of drinking water. *See id.* ¶¶ 1-27. The alleged injury to the organizations is solely expenditure of resources. *See id.* ¶¶ 2, 16. As further detailed herein, Plaintiffs have failed to establish that the individual members identified in the petition have standing and thus the organizations are unable to assert representational standing. *See Md. Highways Contractors Ass'n v. Maryland,* 933 F.2d 1246, 1251 (4th Cir. 1991). Plaintiffs have

---

conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." *Id.* § 1362(14).

[2] "PFAS are a large class of thousands of organic chemicals that have unique physical and chemical properties. These compounds are designed to be stable and non-reactive because of the applications in which they are used: certain industrial and manufacturing processes; stain and water repellants in clothing, carpets, and other consumer products, as well as certain types of fire-fighting foams. PFAS tend to break down slowly and persist in the environment, and consequently, they can accumulate in the environment and the human body over time. Current scientific research and available evidence have shown the potential for harmful human health effects after being exposed to some PFAS. Although some PFAS have been phased out of use in the United States, they are still found in the environment and in humans based on biomonitoring data." 89 Fed. Reg. 32532, 32532 (Apr. 26, 2024).

[3] The Commonwealth argues that its sovereign immunity could be a basis upon which to dismiss this case. The United States takes no position on Virginia's argument insofar as it applies to Plaintiffs' suit against the Commonwealth. The United States does not agree, however, that state laws can limit the United States' access to federal courts.

similarly failed to establish organizational standing because their injury amounts to an organizational expense, which is insufficient to establish an injury here. *See Lane v. Holder*, 703 F.3d 668, 674-75 (4th Cir. 2012).

For the foregoing reasons, this Court should dismiss the Complaint under Federal Rule 12(b)(1) for lack of subject matter jurisdiction.

## BACKGROUND

### I. Statutory Background

#### a. The Clean Water Act ("CWA") and Virginia State Water Control Law

The CWA prohibits the discharge of any pollutant into waters of the United States from a point source except, as relevant here, in compliance with a National Pollutant Discharge Elimination System ("NPDES") permit. *See* 33 U.S.C. §§ 1311(a), 1342(a). The CWA defines the term "pollutant" to include "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." *Id.* § 1362(6). Although not included in the definition of a pollutant, the discharge of stormwater into waters of the United States requires a NPDES permit. *Id.* § 1342(p). If a permit holder discharges pollutants precisely in accordance with the terms of its permit, the permit will "shield" its holder from CWA liability. *See id.* § 1342(k).

Effluent limitations[4] and best management practices[5] serve as methods to control pollutant discharges in a NPDES permit. 40 C.F.R. § 122.44. The Environmental Protection

---

[4] The CWA defines effluent limitations, in relevant part, to mean "quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources[.]" 33 U.S.C. § 1362(11).

[5] "Best management practices ('BMPs') means schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of

3

Agency ("EPA") promulgates effluent limitation regulations, known as Effluent Limitation Guidelines ("ELGs"). 33 U.S.C. § 1314(b). EPA has issued Guidelines for over 50 industry categories. *See* 40 C.F.R. parts 405 – 471. EPA has not promulgated any Guidelines for PFAS. *See* Pet. ¶ 47; *see generally* 40 C.F.R. §§ 401.10–471.106. However, EPA continues to study and assess the technology and viability of effluent limitations for PFAS in different industry categories as part of its annual requirement to review the Guidelines and identify potential new sources and pollutants to promulgate effluent limitations. *See* 33 U.S.C. § 1314(m); *see generally* U.S. Env't Prot. Agency, *Preliminary Effluent Guidelines Program Plan 16* (Dec. 2024), https://www.epa.gov/system/files/documents/2024-12/preliminary-plan-16_december2024_508.pdf (last visited March 8, 2026).[6]

For example, in EPA's most recent plan, the December 2024 Preliminary Effluent Guidelines Program Plan 16, the Agency determined to continue studying effluent limitations for PFAS leaching from landfills, but did not prioritize rulemaking for effluent limitations in industries that formerly used Aqueous Film Forming Foam ("AFFF")—a historical source of PFAS—because there had been an industrywide effort to eliminate the use of AFFF that contains PFAS. U.S. Env't Prot. Agency, *Preliminary Effluent Guidelines Program Plan 16*, at 27-28, 35.

The NPDES permitting program employs a cooperative federalism scheme where EPA can delegate permitting authority to states that request it—Virginia is one such state. *See* 33 U.S.C. § 1342(b)-(d); *United States v. Cooper*, 482 F.3d 658, 661 (4th Cir. 2007) (noting that

---

'waters of the United States.' BMPs also include treatment requirements, operating procedures, and practices to control plant site runoff, spillage or leaks, sludge or waste disposal, or drainage from raw material storage." 40 C.F.R. § 122.2.

[6] In a motion to dismiss asserting a factual challenge to subject matter jurisdiction the Court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *See Mowery v. Nat'l Geospatial-Intel. Agency*, 42 F.4th 428, 433 (4th Cir. 2022) (internal citation and quotation omitted). The Court may take judicial notice of facts "not subject to reasonable dispute" at "any stage of the proceeding." Fed. R. Evid. 201.

4

Virginia administers the state NPDES program). The state agency responsible for issuing NPDES permits in Virginia is VADEQ. Va. Code Ann. § 62.1-44.5. Thus, in Virginia, what would otherwise be a NPDES permit is styled as a permit under the Virginia Pollutant Discharge Elimination System ("VPDES").

In addition to allowing states to issue permits, the CWA requires states to establish water quality standards ("WQS") in accordance with EPA guidance and subject to EPA approval. *See* 33 U.S.C. § 1313; 40 C.F.R. § 131.21. A water quality standard "defines the water quality goals of a water body, or portion thereof, by designating the use or uses to be made of the water and by setting criteria necessary to protect the uses." 40 C.F.R. § 130.3. The water quality criteria may be numeric or narrative. *Id.* § 131.11(b)(1). EPA has prescribed numeric criteria for a list of toxic pollutants that states must at least meet; states may impose stricter requirements. *Id.* § 131.36(c) (referring to 40 C.F.R. § 131.36(b) criteria). Narrative criteria apply where numeric criteria cannot be established or to supplement numeric criteria. *Id.* § 131.11(b)(2). Virginia has established both numeric and narrative criteria for surface waters, generally. 9 Va. Admin. Code § 25-260-20; 9 Va. Admin. Code § 25-260-50–187. Virginia lacks any PFAS numerical water quality criterion for surface water. *See id.* § 25-260-140 (providing a table of parameters with different criteria depending on the use designation).

### b. The Virginia Administrative Process Act ("Virginia APA")

Virginia's State Water Control Law confers standing to challenge, among other things, final VPDES permitting decisions upon any person who participated in the public comment process through the Virginia APA, provided the person also has standing under Article III of the U.S. Constitution. Va. Code Ann. § 62.1-44.29. Courts have interpreted the Water Control Law to confer representational standing. *Chesapeake Bay Found., Inc. v. Commonwealth ex rel. Va. State Water Control Bd.*, 46 Va. App. 104, 118 (2005).

## II. Factual Background

### a. Procedural Background

On October 1, 2025, VADEQ issued VPDES permit number VA0092771 allowing U.S. Army Garrison, Fort Belvoir to discharge stormwater into the Potomac River Basin through Accotink Creek and other streams. Pet. ¶ 88. Plaintiffs informed the parties of a notice of appeal on October 31, 2025, and then filed petition for appeal in the City of Charlottesville Circuit Court on December 1, 2025.[7]

On December 19, 2025, the United States removed the action to this Court. ECF No. 1. On January 14, 2026, Defendant VADEQ moved to dismiss. ECF Nos. 9-11. The United States subsequently filed an unopposed Motion for Extension of Time to file its response to the removed petition. ECF No. 12.

### b. The Parties

Plaintiffs are two public interest groups – Wild Virginia and Riverkeeper – and several named members of each group.

#### i. The Organizations - Wild Virginia and Riverkeeper

Wild Virginia is a non-profit organization whose mission is to "protect and connect Virginia's wild places, including by strengthening habitat connectivity, protecting water quality, limiting environmental harms of gas infrastructure, training volunteers through its Clean Water Advocates Program, and providing educational opportunities to connect people to the wild places they love." Pet. ¶ 1.

Riverkeeper is also a non-profit organization whose mission is "to protect the right to clean water for all communities and all those who live in and rely upon the Potomac and Shenandoah watersheds by stopping pollution, making drinking water safe, protecting healthy

---

[7] In state court documents, Plaintiffs appear as "Appellants."

river habitats, and enhancing use and enjoyment for all." *Id.* ¶ 11. Riverkeeper asserts that effluent limits for PFAS or monitoring would alleviate its need to divert resources to investigate and document potential PFAS from Fort Belvoir and allow its members to use the receiving waters. *Id.* ¶ 16. Riverkeeper participated during the permitting process for Fort Belvoir. *Id.* ¶ 27.

### ii.  Individually Named Members of Wild Virginia and Riverkeeper

Wild Virginia and Riverkeeper have identified a total of five individual members (two from Wild Virginia and three from Riverkeeper) in support of their assertion of representational standing.

Nancy Armour is a member of Wild Virginia and owns a home in Montross with a pier on the Potomac River. Pet. ¶ 5. Ms. Armour alleges that she enjoys boating, swimming, fishing, and crabbing in the River. *Id.* She has eaten out of the Potomac for more than twenty years, but limited her consumption over the past ten years since learning more about PFAS. *Id.* She is concerned "generally [about] the entire food chain" but has observed fewer ospreys over the past several years and thinks that is due to PFAS. *Id.* ¶ 6. The drinking water for her second home, in Woodbridge, Virginia, is sourced from the Occoquan River. *Id.* ¶ 7. She asserts that "monitoring and limitations on discharges of PFAS in Ft. Belvoir's permit" would make her worry less about long-term health impacts to her, her family, and the ecosystem generally. *Id.* ¶ 8.

The second member of Wild Virginia is George Semenov who lives in Falls Church, Virginia. *Id.* ¶ 9. Mr. Semenov alleges that he kayaks on the Potomac River between Alexandria and Westmoreland County and asserts that his drinking water comes from the Potomac River. *Id.* As a kayaker, he is concerned about accidental ingestion of river water. *Id.* He believes that "monitoring and limits on PFAS discharges would . . . [help him] worry less about his drinking water being contaminated" and "again enjoy kayaking with his family and friends in the Potomac without concerns over everyone's health." *Id.*

The first Riverkeeper member is Dean Naujoks who is also the organization's "Riverkeeper." *Id.* ¶ 14. In that role, he advances Riverkeeper's mission of addressing pollution in the Potomac and conducts water quality monitoring in Pohick Bay. *Id.* ¶¶ 14-15. He asserts that, if the permit requires effluent testing or limits, then his organization can direct its resources to other areas. *Id.* ¶ 16.

The second member of Riverkeeper is Camilla Ng who lives in Alexandria, Virginia, and frequently kayaks and paddles in the Accotink and Pohick Bay area. *Id.* ¶ 17. She also enjoys birdwatching, but her "enjoyment of the biodiversity of Accotink Bay and Pohick Bay is marred by her worries that the PFAS contamination from Fort Belvoir will harm the ecosystem and diminish wildlife populations in the area." *Id.* She is also worried about accidental ingestion from her activities on the water. *Id.* ¶ 18. During the permitting process, Ms. Ng provided oral and written comments to VADEQ. *Id.* ¶ 19. She asserts that, if the permit were to "include limitations on discharges of PFAS in Fort Belvoir's permit, [she] would feel more comfortable recreating in Accotink Bay and Pohick Bay and once again enjoy them[.]" *Id.*

The final named member of Riverkeeper is Dr. Larry Zaragoza who alleges that he participates in paddling, birdwatching, and recreational activities in and around Pohick Bay and Accotink Creek. *Id.* ¶ 22. He states that he avoids eating fish taken from around the Fort Belvoir area and deters others from water activities because of PFAS. *Id.* ¶¶ 22, 24. Dr. Zaragoza provided oral comments to VADEQ during the permitting process. *Id.* ¶ 25. Dr. Zaragoza asserts that monitoring and testing would result in less PFAS in the watershed around Fort Belvoir and will provide the community "with better information about their risk of exposure to PFAS when using these waters." *Id.* ¶ 26.

**STANDARD OF REVIEW**

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the court must determine whether the complaint sets forth allegations sufficient to establish the court's jurisdiction over the claims for relief. To invoke the jurisdiction of federal courts, plaintiffs bear the burden of establishing that they meet the "irreducible constitutional minimum" of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Each element of standing "must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Id*. at 561. Accordingly, for the purpose of a motion to dismiss for lack of standing, the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). The "lack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011); *accord Taubman Realty Grp. Ltd. P'ship v. Mineta*, 320 F.3d 475, 481 (4th Cir. 2003).

## ARGUMENT

### I. Plaintiffs Lack Article III Standing.

An organization "can allege standing based upon two distinct theories"—organizational standing in its own right, and representational standing on behalf of members who have been harmed. *Md. Highways Contractors Ass'n*, 933 F.2d at 1250. Here, Plaintiffs assert both. As we show below, however, the individually named members of Wild Virginia and Riverkeeper do not have Article III standing; thus, Plaintiffs' assertion of representational standing must fail. In addition, because Wild Virginia and Riverkeeper themselves have not alleged a credible injury-in-fact, they lack standing in their organizational capacity.

### A. Plaintiffs Cannot Establish Representational Standing.

9

An organization may assert representational standing when: "(1) at least one of its members would have standing to sue in his own right; (2) the organization seeks to protect interests germane to the organization's purpose; and (3) neither the claim asserted nor the relief sought requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.* ("*Gaston Copper*"), 204 F.3d 149, 155 (4th Cir. 2000) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). As to the first element of representational standing, the ability to sue in their own right, the individual member must allege: "(1) they suffered an injury-in-fact that was concrete and particularized and either actual or imminent; (2) there was a causal connection between the injury and the defendant's conduct (i.e. traceability); and (3) the injury was likely to be redressable by a favorable judicial decision." *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 619 (4th Cir. 2018) (citing *Lujan*, 504 U.S. at 560-61).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560)). In the environmental context, the Supreme Court has explained that "[t]he relevant showing for purposes of Article III standing … is not injury to the environment but injury to the plaintiff." *Friends of the Earth, Inc., v. Laidlaw Env't Servs., Inc.* ("*Laidlaw*"), 528 U.S. 167, 181 (2000). A party can establish that injury by asserting that it uses the affected resource and that its aesthetic or recreational enjoyment of that resource is diminished by the challenged activity. *Id.* Concerns about health effects may also establish an injury for purposes of standing. *Gaston Copper,* 204 F.3d at 156-57.

In addition to injury, the plaintiff must establish causation; that the injury is "fairly . . . trace[able] to the challenged action[.]" *Lujan*, 504 U.S. at 560 (citation omitted). And "it must be

10

'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (citation omitted). Where, as here, "the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Id.* at 562 (citation omitted).

Here, the individual members of the Plaintiff organizations have asserted recreational, aesthetic, and health concerns as injuries. *See supra* BACKGROUND II.b.ii. Although some of their alleged harms may suffice in another context, some are simply too speculative or vague to qualify as a concrete injury. For one, Ms. Armour states she has observed fewer ospreys over the past several years and thinks it may be due to PFAS. Pet. ¶ 6. That type of speculation about a complex question of ecology plainly lacks concreteness. The same holds true for Ms. Ng's "worries that the PFAS contamination from Fort Belvoir will harm the ecosystem and diminish wildlife populations in the area." *Id.* ¶ 17. Also lacking concreteness is Dr. Zaragoza's assertion that the "unrestricted discharge of PFAS from Fort Belvoir . . . diminished his . . . aesthetic … enjoyment of the surrounding watersheds," *id.* ¶ 22, without any explanation of *how* PFAS affected the aesthetics.

Even if the other alleged injuries might suffice for Article III purposes in a citizen suit against a permit violator, *see Laidlaw*, 528 U.S. at 174-77, 181-83, this is not such a case. Rather, Plaintiffs here challenge VADEQ's issuance of a permit. Thus, Plaintiffs must establish that the issuance of that permit caused their alleged injuries or, in other words, that those injuries are traceable to the permit. They have failed to meet that burden here. Indeed, nearly all the injuries Plaintiffs' members assert are traceable to (alleged) PFAS in the Potomac River watershed that existed before Virginia issued the permit. *See* Pet. ¶¶ 5-9, 17-26 (concerns about exposure to PFAS during recreational activities on the water, eating food sourced from the area, and

11

ingesting drinking water drawn from the Potomac). Thus, Plaintiffs' allegations fall short of establishing that Virginia's permit caused any of their injuries.

Likewise, Plaintiffs cannot show that a favorable ruling from the Court is likely to redress their alleged injuries. As noted, Plaintiffs' alleged injuries are traceable to PFAS in the watershed that predated VADEQ's issuance of the permit. Thus, a ruling that invalidates the permit will do nothing to abate those harms. Moreover, the only remedy the Court can impose is to remand the permit to VADEQ for further review in the agency's discretion. *See* Va. Code Ann. § 2.2-4029. Given the absence of ELGs or a Virginia water quality standard for PFAS, it is less than likely that VADEQ would, on remand, craft an effluent limitation for PFAS that satisfies Plaintiffs' concerns. But even if it did, Plaintiffs do not allege that Fort Belvoir is the only contributor of PFAS to the Potomac. Nor can they plausibly assert that new effluent limitations or monitoring requirements in Fort Belvoir's permit would do anything about preexisting PFAS or reduce PFAS in the Potomac to levels that allay their concerns. *Cf. W. Va. Rivers Coal., Inc. v. Chemours Co. FC, LLC,* 793 F. Supp. 3d 790, 808 (S.D. W. Va. 2025) (finding redressability where the court could order the defendant to comply with its discharge permit). Because a remand of the permit is unlikely to redress Plaintiffs' alleged injuries, Plaintiffs have failed to establish their Article III standing.

For the foregoing reasons, the named members of the Plaintiff organizations have not established individual standing to sue; thus, the Plaintiff organizations cannot assert representational standing on their behalf. The Court should grant the United States' motion.

### B. Plaintiffs Cannot Establish Organizational Standing.

For an organization to have standing in its own right, it must meet the same elements required for an individual – injury, causation, and redressability. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393-94 (2024).

An organization suffers an injury when a policy or practice frustrates the purpose of the organization and causes it to drain its resources. *People for the Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Md., Inc.* ("*Tri-State Zoological Park*"), 843 F. App'x 493, 495-96 (4th Cir. 2021). Importantly, a diversion of resources, absent impediment, does not establish standing. *All. for Hippocratic Med.*, 602 U.S. at 395 (noting that, if simply expending resources was sufficient to establish standing, then every public interest organization would have standing to challenge federal policy). Moreover, "[l]ike an individual, an organization may not establish standing simply based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct." *Id.* at 394 (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982)).

In this case, Plaintiffs' allegations show that they have expended resources, but not that they have suffered any impediment to their mission. As such, they have failed to allege sufficient facts to establish organizational standing. The alleged injury that Plaintiffs have suffered, including those asserted by Mr. Naujoks as the Riverkeeper, are simply expenditures of resources in furtherance of their organizational purpose. Wild Virginia asserts they have spent "significant staff time and resources to educating the public, decision makers, and the media about PFAS" and participated in the permit process. Pet. ¶¶ 2, 10. Riverkeeper states that "[i]f Fort Belvoir is required to limit or monitor its industrial stormwater discharges for PFAS, that will alleviate to some extent the need to continue diverting resources to investigate and document PFAS contamination from Fort Belvoir." *Id.* ¶ 16. Those allegations are insufficient to establish standing because Plaintiffs identify no action by Defendants that has impeded their mission. Plaintiffs' strong interest in protecting the Potomac River Basin in furtherance of their organizational purpose is similarly unavailing. *See All. for Hippocratic Med.*, 602 U.S. at 394. Rather, Plaintiffs are organizations that "'seek[] to do no more than vindicate [their] own value

preferences through the judicial process'" and, thus, they "cannot establish standing." *Tri-State Zoological Park*, 843 F. App'x at 495 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972)).

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant its motion and dismiss the Complaint for lack of jurisdiction.

Respectfully submitted,

ROBERT N. TRACCI
Acting United States Attorney

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

Date:  March 11, 2026

/s/  *Thomas V. Hughes*
THOMAS V. HUGHES
Special Assistant United States Attorney
South Carolina Bar No. 100647
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Telephone: (202) 532-3261
Facsimile: (202) 514-8865
E-mail: Thomas.Hughes2@usdoj.gov

/s/  *Krista Consiglio Frith*
KRISTA CONSIGLIO FRITH
Assistant United States Attorney
Virginia State Bar No. 89088
P.O. Box 1709, Roanoke, VA 24008-1709
Tel: (540) 857-2250
Fax: (540) 857-2283
Krista.Frith@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2026, I caused a true copy of the foregoing Motion for Extension of Time to Answer or Otherwise Plead to be electronically filed with the Clerk of the Court using the CM/ECF system, which will provide electronic notice to the following:

Claire Marie Horan
Appalachian Mountain Advocates
P.O. Box 403
Charlottesville, Virginia 22902

John D. Gilbody
Senior Assistant Attorney General
Office of the Attorney General
202 North 9th Street
Richmond, VA 23219

*/s/ Thomas V. Hughes*
Thomas V. Hughes
Special Assistant United States Attorney