IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

WILD VIRGINIA and POTOMAC
RIVERKEEPER NETWORK,

        Plaintiffs,

        v.

VIRGINIA DEPARTMENT OF
ENVIRONMENTAL QUALITY,
MICHAEL ROLBAND, in his official
capacity as Director of Virginia
Department of Environmental Quality,
and UNITED STATES DEPARTMENT
OF THE ARMY, U.S. ARMY
GARRISON – FORT BELVOIR,

        Defendants.

CIVIL ACTION NO. 3:25-cv-0100

PLAINTIFFS' RESPONSE TO
THE VIRGINIA DEPARTMENT OF ENVIRONMENTAL QUALITY
AND MICHAEL ROLBAND'S MOTION TO DISMISS
AND THE UNITED STATES ARMY'S MOTION TO DISMISS

Plaintiffs Wild Virginia and Potomac Riverkeeper Network hereby respond to the Department of Environmental Quality and Michael Rolband's (collectively, "VDEQ") Motion to Dismiss and the United States Army's ("the Army") Motion to Dismiss. VDEQ and the Army both move to dismiss Plaintiffs' claims on grounds that Plaintiffs lack standing. VDEQ additionally asserts that this case may not be heard in federal court due to Virginia's sovereign immunity. Neither argument has merit, and both motions should be denied. Plaintiffs have adequately alleged standing, and, even if Virginia is immune from being haled into federal court to defend this case, that is grounds for remand back to state court rather than dismissal.

First, Plaintiffs have adequately alleged representational standing at this stage of the case, and these allegations are supported by the attached declarations of Dean Najouks, who is employed by Potomac Riverkeeper Network as the Potomac Riverkeeper, and of four members of Wild Virginia and Potomac Riverkeeper Network: George Semenov, Nancy Armour, Camilla Ng, and Larry Zaragoza. Under Section 62.1-44.29 of Virginia's State Water Control Law, persons have standing to challenge permits issued by VDEQ under the Administrative Process Act ("VAPA") if they have submitted public comments during the permitting process and can establish federal Article III standing.

As shown by the allegations in the Petition and by these declarations, Plaintiff organizations each have members that are harmed recreationally (through causing them to recreate in impacted waters less often, enjoy themselves less when they do, and consume less fish and other food caught locally); aesthetically (through decreased enjoyment of and increased concern for these contaminated waterways and the ecosystem that depends on them); psychologically (through worrying about risks to their own and loved ones' health from ingesting water or fish from waters polluted by PFAS discharged from Fort Belvoir); and informationally (through being deprived of monitoring data on PFAS discharges that would allow them to better assess their health risks from exposure to affected waters). These current, concrete harms are caused by VDEQ's issuance of a Virginia Pollutant Discharge Elimination System ("VPDES") industrial stormwater permit to Fort Belvoir that contains no monitoring requirements or effluent limits for PFAS discharges, and these harms would consequently be redressed by a permit that contained these requirements.

Second, VDEQ presents unconvincing arguments that Virginia has not waived sovereign immunity from being haled into federal court for administrative challenges such as this one, particularly for cases subject to removal, such as those involving federal permittees; however,

2

Fourth Circuit case law makes clear that, if this Court cannot hear the case, the Court must remand the case back to state court under 28 U.S.C. § 1447(c), rather than dismiss it.

For these reasons, the Court should deny VDEQ and the Army's motions to dismiss.

## BACKGROUND

It is well-known to the Army, VDEQ, and the public that the soil, surface water, and groundwater at Fort Belvoir is contaminated with high levels of per- and polyfluoroalkyl substances ("PFAS"). Pet. ¶ 60. In particular, a 2022 Army study revealed that high levels of three types of PFAS—perfluorooctane sulfonate (PFOS), perfluorooctanoic acid (PFOA), and perfluorobutanesulfonic acid (PFBS). *Id.* ¶ 65. PFAS have a number of properties that make them particularly dangerous pollutants. They are commonly referred to as "forever chemicals" because they "do not break down or degrade over time and are therefore highly persistent." *Ctr. For Env't Health v. Regan*, 103 F.4th 1027, 1031 (4th Cir. 2024) (internal quotation marks omitted); *see also* Pet. ¶ 61. They can travel long distances in both surface water and groundwater. *Id.* ¶ 71. They bioaccumulate, becoming more concentrated in organisms higher up in the food chain, including humans. *Id.* ¶ 64.

And PFAS are known to cause a variety of serious human health impacts at even very low concentrations, including reproductive effects; developmental effects or delays in infants, children, and adolescents; increased risk of prostate, kidney, and testicular cancers; reduced immune function; interference with hormone function; increased cholesterol levels; and increased risk of obesity. *Id.* The U.S. Environmental Protection Agency ("EPA") has determined that PFOS and PFOA are likely carcinogens, which are harmful to humans at any level of exposure. *Id.* ¶¶ 64, 72.

Fort Belvoir discharges stormwater from outfalls that flow directly into unnamed tributaries to Accotink Creek and Accotink Bay, Dogue Creek, Mason Run, and Dunston Bay. *Id.*

¶ 69. From there, the discharges flow into Pohick Bay, Gunston Cove, and the Potomac River. *Id.*

¶ 70. While VDEQ was reviewing Fort Belvoir's application to renew its permit under the National Pollutant Discharge Elimination System ("NPDES") program to allow these discharges, VDEQ was in possession of sampling data collected from Accotink Creek showing high concentrations of PFOS, PFOA, PFBS, and a variety of other PFAS. *Id.* ¶ 75. Public comments submitted by Plaintiffs on VDEQ's draft permit emphasized the proximity of the outfalls covered by the permit to areas at Fort Belvoir with documented PFAS contamination. *Id.* ¶ 82. Public commenters, including Plaintiffs, urged VDEQ to include monitoring requirements and effluent limitations for PFAS, among other things, in Fort Belvoir's final permit. *Id.* Despite the abundant evidence in VDEQ's possession that Fort Belvoir's stormwater discharges likely contained PFAS at high levels and despite the public's entreaties, VDEQ declined to address PFAS at all in the permit, which it issued on October 1, 2025. *Id.* ¶¶ 88–89.

## ARGUMENT

I.    **Wild Virginia and Potomac Riverkeeper Network Have Adequately Alleged Representational Standing at this Stage of the Case.**

VDEQ and the Army raise a number of arguments that Plaintiffs lack representational standing, none of which have merit. Neither party disputes that Plaintiffs participated in the public comment process; that other than participating in the public comment process, Plaintiffs need only satisfy federal constitutional Article III standing; that representational standing is available under the VAPA's judicial review provision; or that Plaintiff organizations satisfy the requirements for representational standing that the claims be germane to the organizations' mission and that individual participation of the members is not necessary. *See* VDEQ Motion to Dismiss at 7; Army Motion to Dismiss at 10–11. Instead, both argue that Plaintiffs' members have not adequately alleged the elements of Article III standing: harm, causation, and redressability. Both VDEQ and

the Army attempt to impose a standing hurdle much higher than what Article III case law requires. When the appropriate standard is applied, Plaintiffs ably meet it.

### a. Statement of Article III standing law

To have Article III standing, a plaintiff must suffer an actual or threatened injury-in-fact that is fairly traceable to the challenged action by the defendant and is likely to be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

As the Fourth Court has explained, "[i]n the environmental litigation context, the standing requirements are not onerous." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003). The claimed injury "need not be large, an identifiable trifle will suffice." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 156–57 (4th Cir. 2000) (*en banc*) (cleaned up).

### b. Plaintiffs' members show they have all three elements of Article III standing.

The below summary of each members' averments, as captured in the attached declarations, describes how each individual is harmed by Fort Belvoir's permit, how these harms are directly caused by VDEQ's issuance of the unlawful permit, and how these harms will be redressed by remand for lawful agency action (in the form of a permit that includes limitations on PFAS discharges and monitoring requirements).

*George Semenov*

George Semenov is a member of Wild Virginia. Semenov Decl. ¶6. An "avid kayaker and nature lover," Mr. Semenov has been kayaking in the Potomac River for 45 years. *Id.* ¶¶ 4, 5. He lives in Falls Church, Virginia, with his wife and daughter, where he has owned a home for over 35 years. *Id.* ¶ 2. He often kayaks in the stretch of the Potomac River between Alexandria and Westmoreland County. *Id.* ¶ 5.

Fort Belvoir's discharges of PFAS into the Potomac River and its tributaries make him "concerned" for the harm these discharges do to the "environment and local wildlife," as he understands that PFAS is carcinogenic, has other long-term health effects, and can bioaccumulate in the environment. *Id.* ¶ 8. Mr. Semenov also feels "concerned for [his] own and [his] family's health" because the Potomac River is the source of his family's drinking water and because of the health risks of ingesting river water, which he avers is an unavoidable part of kayaking that he has experienced many times. *Id.* ¶¶ 9, 10. Mr. Semenov has shared his love of kayaking on the Potomac with his daughters and grandchildren. His grandchildren—six, seven, and eight years old—have just begun learning to kayak, and he worries about the health risks to them and to his daughters from ingesting river water when they kayak together. *Id.* ¶ 11.

Despite his worries about the PFAS contamination from Fort Belvoir, Mr. Semenov plans to continue kayaking in the Potomac; however, the PFAS contamination "diminishes [his] enjoyment of kayaking and enjoying nature on the Potomac." *Id.* ¶ 10. If VDEQ imposes monitoring and discharge limits for PFAS in Fort Belvoir's VPDES permit, Mr. Semenov "would worry less about [his] drinking water being contaminated and [he] would again enjoy kayaking with [his] family and friends in the Potomac without concerns over everyone's health." *Id.* ¶ 13.

*Nancy Armour*

Nancy Armour is a member of both Wild Virginia and Potomac Riverkeeper Network. Armour Decl. ¶4. Ms. Armour and her husband own a waterfront home on the Potomac River in Westmoreland County. *Id.* ¶ 2. They host large family gatherings at their home, "enjoying activities on the Potomac River and its tributaries, including boating, fishing, swimming, and crabbing." *Id.* ¶ 3. She and her family "have always eaten fish, seafood, crabs, and oysters from the Potomac." *Id.* Ms. Armour submitted public comments to VDEQ and attended a public hearing on Fort Belvoir's permit because she is "very concerned about the concentrations of PFAS in the Potomac River watershed" from Fort Belvoir's discharges as well as other sources. *Id.* ¶ 7.

She is "significantly concerned about long-term health impacts on [her own] health and [her] family's health from eating food contaminated with PFAS," so she now limits how much food from the Potomac that she and her family consume. *Id.* ¶ 8. Ms. Armour believes that the drinking water at the family's other residence in Woodbridge, Virginia, which comes from the Occoquan Reservoir, "may also be contaminated with PFAS." *Id.* ¶ 10. She "worr[ies] about the combined impacts" on the family's long-term health from their various exposures to PFAS in their everyday life, "including from Fort Belvoir's discharges." *Id.* Ms. Armour also worries about the effects of PFAS on local wildlife, including ospreys and dolphins, especially because PFAS is known to bioaccumulate. *Id.* ¶ 9. Similarly to Mr. Semenov, Ms. Armour's worries about PFAS contamination will be lessened if VDEQ issues Fort Belvoir a VPDES permit that includes monitoring and limitations for PFAS. *Id.* ¶ 11. She "will worry less about [her own] and [her] family's long-term health, as well as the health of the local ecosystem, and recover the same level of enjoyment [she] used to have spending time on and eating food from the Potomac River." *Id.*

*Camilla Ng*

Camilla Ng, a member of Potomac Riverkeeper Network, lives in Alexandria and is "an avid paddler and kayaker in the local waterways." Ng Decl., ¶¶ 3, 4. She "frequently recreate[s] in Accotink Bay and Pohick Bay, which are directly adjacent and downstream of Fort Belvoir." *Id.* ¶ 5. She enjoys stand-up paddleboarding and kayaking in both bays and has participated in organized paddling events there. *Id.* She "sincerely appreciate[s] the beauty of these bodies of water" and enjoys observing many species of birds when recreating there, particularly at sunset. *Id.* ¶ 6. Ms. Ng explains that "[t]he marsh provides wild rice and fish for birds such as ospreys, great blue herons, bald eagles, great egrets, double-crested cormorants, red-winged blackbirds, and many songbirds migrating to and from Central and South America." *Id.* As she sees it, "[t]he kinds of wildlife that return seasonally and the amount of wildlife that returns demonstrate that Pohick Bay and neighboring wetlands provide vital food for migratory birds." *Id.* ¶ 13. She views the area as a "sanctuary for both wildlife and humans," and notes that the Elizabeth Hartwell Mason Neck National Wildlife Refuge—located downstream of Accotink Creek on the Potomac River—"aims to protect wildlife such as eagles." *Id.* ¶ 14.

Ms. Ng believes that the "beautiful, delicate biodiversity [of the ecosystem in this area] is threatened by Fort Belvoir's release of PFAS-contaminated stormwater." *Id.* ¶¶ 6, 13, 14. Ms. Ng's "enjoyment of these waters is marred by [her] worries that the PFAS contamination from Fort Belvoir will harm the ecosystem and diminish wildlife populations in the area." *Id.* She "understand[s] the Army's studies have confirmed PFAS contamination in the wetlands, groundwater, and soils surrounding Fort Belvoir" and "that the water quality of the affected rivers and waterways, including Accotink Creek, its tributaries, the Potomac River, and the Chesapeake Bay watershed, has deteriorated due to documented pollution from high levels of PFAS." *Id.* ¶ 7.

8

She is "very concerned" about bioaccumulation in wildlife, especially wildlife that eat fish from these waterbodies. *Id.* ¶ 12. She is similarly concerned about her own consumption of seafood caught there, as well as the local community's; she notes that snakehead fish, which fishermen catch at Pohick Bay, is a "popular fish consumed by the surrounding community" and that "unknowing individuals who consume these fish are at risk of experiencing health issues." *Id.*

Ms. Ng used to enjoy recreating in Pohick Bay and Accotink Bay "regularly," but her awareness of the PFAS contamination causes her to now enjoy recreating there "less" than she did in the past. *Id.* ¶ 8. She may even recreate in these areas less regularly due to her concerns for the "ecological value of Pohick Bay and Accotink Creek[, which] is close to sacred for [her]." *Id.* ¶ 9. As this ecological value is "one of the main reasons" she enjoys recreating there, "[t]he failure of the permit to adequately address the PFAS contamination of these waterbodies directly threatens [her] ability to enjoy the recreational and aesthetic values of these areas." *Id.* Like Mr. Semenov, Ms. Ng also worries about the health impacts to herself and others from PFAS exposure "from the inevitable water contact"—such as falling into the water and "swallowing contaminated water"— that accompanies these kinds of recreation. *Id.* ¶ 11.

Ms. Ng opposed VDEQ's draft permit because it lacked monitoring or limitations for PFAS discharges despite known contamination at the site and "evidence of past and likely future discharges" of PFAS. *Id.* ¶ 15. She provided oral comments at a public hearing on Fort Belvoir's permit and submitted written comments as well, advocating for "[her]self and others who use waterbodies near to and downstream from Fort Belvoir [who] have been exposed to PFAS because of Fort Belvoir's stormwater discharges" and urging VDEQ to "protect[] the environment and prevent[] pollution." *Id.* ¶¶ 15, 16. Ms. Ng avers, similarly to Mr. Semenov and Ms. Armour, that "[i]f [VDEQ] includes limitations on discharges of PFAS in Fort Belvoir's permit, [she] would

feel more comfortable recreating in Accotink Bay and Pohick Bay and enjoy them again like [she] used to." *Id.* ¶ 18.

*Larry Zaragoza*

Larry Zaragoza is a member of Potomac Riverkeeper Network who lives in Alexandria, Virginia. Zaragoza Decl., ¶¶ 2, 3. He holds a Doctorate degree in Environmental Science and Engineering and worked for the EPA for over 40 years before retiring. *Id.* ¶ 4. He now chairs the the Environment and Recreation Committee for the Mount Vernon Council of Citizens Associations, which includes approximately 40 community associations, and he also chairs the Fairfax County Environmental Quality Advisory Council (EQAC), which serves as an advisory group to the Fairfax County Board of Supervisors. *Id.* ¶ 5.

Mr. Zaragoza participated in the Fort Belvoir public commenting process by drafting and presenting a resolution on the need for Ft. Belvoir's stormwater permit to include limits on PFAS discharges, which was adopted by the General Membership of the Mount Vernon Council of Citizens Associations and transmitted to VDEQ in May of 2025. *Id.* He also provided oral testimony at a public hearing on VDEQ's draft permit, in which he "expressed [his] concerns about the diminished water quality surrounding Ft. Belvoir" and "opposed the draft permit because it failed to include requirements for monitoring or limitations on the discharge of PFAS." *Id.* ¶ 8.

Mr. Zaragoza is harmed by the "continued, unrestricted discharge of PFAS from [Fort Belvoir" in that it "has diminished [his] personal, aesthetic, and recreational use and enjoyment of the surrounding watersheds." *Id.* ¶ 10. He is "concerned about [his] exposure to PFAS due to the inevitable water contact, including accidental ingestion of water, involved in swimming, paddling, and other recreational activities." *Id.* He is also frustrated that, "as a community advocate for

outdoor recreation, [he has] to deter community members from certain water activities because of the risk of PFAS contamination. *Id.* Drawing on his long experience in environmental policy and risk assessment, he is aware that "[a]llowing PFAS to continue to spread in the environment will significantly increase the cost of cleanup and put people and the environment at risk." *Id.* ¶¶ 4, 11, 15.

Because he understands that PFAS bioaccumulation in fish tissue "impacts the safety of fish for consumption," he "avoid[s] eating locally caught seafood and caution[s] others" to do the same for fish caught in the watersheds surrounding Fort Belvoir. *Id.* ¶¶ 12, 13. If this lawsuit is successful, the harms Mr. Zaragoza "[has] experienced will be at least somewhat alleviated because there will be less PFAS contamination in the watersheds surrounding [Fort Belvoir]. Additionally, monitoring requirements will provide [him] and other community members with better information about [their] level of risk exposure when using these waters." *Id.* ¶ 16.

### c. *Defendants seek a higher hurdle for Article III standing than is rooted in law.*

With respect to harm, the Army appears to concede (at 10–11) that Plaintiff members have adequately alleged cognizable harms for purposes of Article III standing, citing *Laidlaw* and *Gaston Copper*: "A party can establish [injury in fact] by asserting that it uses the affected resource and that its aesthetic or recreational enjoyment of that resource is diminished by the challenged activity. . . . Concerns about health effects may also establish an injury for purposes of standing."

In contrast, VDEQ asserts (at 1) that none of the Plaintiffs' members "state a sufficiently immediate or concrete harm" because, according to VDEQ (at 1–2), they "express no more than vague 'worries' and 'concerns' about the potential impact that PFAS that may emanate from Fort Belvoir in the future will have on their health or the environment." As the attached declarations of Wild Virginia and Potomac Riverkeeper Network's members show, their injuries are specific and

current. Mr. Semenov, Ms. Armour, Ms. Ng, and Mr. Zaragoza have articulated how the permit's lack of protection from current (not future) PFAS discharges harms them personally. Together, Plaintiffs' members have averred that VDEQ's permit, which allows Fort Belvoir to discharge PFAS without limitations of any kind or even monitoring requirements, harms them in a variety of ways, all of which are specific and current. They are harmed recreationally (through causing them to recreate in impacted waters less often, enjoy themselves less when they do, and consume less fish and other food caught locally); aesthetically (through decreased enjoyment of and increased concern for these contaminated waterways and the ecosystem that depends on them); psychologically (through worrying about risks to their own and loved ones' health from ingesting water or fish from waters polluted by PFAS discharged from Fort Belvoir); and informationally (through being deprived of monitoring data on PFAS discharges that would allow them to better assess their health risks from exposure to affected waters).

Plaintiff members do not—and are not required to claim in order to establish standing— that their physical health is definitively being harmed by exposure to PFAS molecules that originate at Fort Belvoir. It is well-settled U.S. Supreme Court precedent that plaintiffs who are "concerned about harmful effects from discharged pollutants" on their recreational area, and who consequently refrain from taking part in the same activities they did before or enjoy them less, have "adequately alleged injury in fact." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) ("We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."). These aesthetic and recreational harms are enough; actual environmental damage need not be alleged. In explaining this in *Laidlaw*, the Supreme Court cautioned against "rais[ing] the standing hurdle

higher than the necessary showing for success on the merits." *Id.* at 181. Even absent any evidence that these waters are contaminated with PFAS flowing from Fort Belvoir, Plaintiff members have standing because the permit allows for Fort Belvoir to discharge PFAS in any amount, threatening downstream waters and leading these individuals to have diminished enjoyment due to their awareness that the water is unsafe and impacting the ways they use these waters. *Gaston Copper*, 204 F.3d at 162.

VDEQ then asserts (at 2) that these averred harms are insufficient to confer standing because they "are not tied to any violation of law or level of exposure." VDEQ cites no authority for this, because no such requirement exists in Article III standing jurisprudence. Of course, the Petition *does* tie the harm to violations of law—VDEQ's violations of the VAPA and the Clean Water Act in granting Fort Belvoir an industrial stormwater permit with no limitations or monitoring requirements for PFAS. Several of the declarations mention these violations specifically, though standing declarants are not required to have that level of legal knowledge. *See* Semenov Decl. ¶ 13; Armour Decl., ¶ 11; Ng Decl., ¶¶ 15, 18; Zaragoza Decl., ¶¶ 8, 16.

As for VDEQ's criticism that Plaintiff members do not specify a level of PFAS exposure, it bears noting that there is scientific consensus that even low levels of of PFAS have various and serious human health effects; two well-studied PFAS that are present at Fort Belvoir—PFOS and PFOA—are likely carcinogens for which there is no safe exposure. Pet. ¶ 64. However, Plaintiffs' members understand that greater exposure to PFAS entails greater health risks, and that Fort Belvoir's discharges into the waterbodies they use increase their exposure to PFAS. *See, e.g.*, Armour Decl. ¶ 10 (explaining her worries about health risks due to her combined exposure to multiple sources of PFAS).

And, as both *Laidlaw* and *Gaston Copper* make clear, Plaintiffs do not need to demonstrate that the waterbodies used by Plaintiff members are contaminated at all—let alone at a specific level—to establish Article III standing. In *Laidlaw*, the Supreme Court rejected the same argument that the plaintiffs lacked standing because there was "no demonstrated proof of harm to the environment" or of "*any health risk*" from its unlawful discharges. 528 U.S. at 181–82 (emphasis added). Similarly, in *Gaston Copper*, the Fourth Circuit found that the plaintiff had standing even though "[n]o evidence was presented concerning the chemical content of the waterways affected by the defendant's facility" and "[n]o evidence of any increase in the salinity of the waterways, or any other negative change in the ecosystem of the waterway was presented." 204 F.3d at 155–56 (cleaned up). The Fourth Circuit explained that denying standing in *Gaston Copper* would have essentially recreated "the old system of water quality standards whose failure led to the enactment of the Clean Water Act in the first place" and ignored Congress's "shift to end-of-pipe standards" in order to eliminate complex scientific questions in enforcement proceedings. *Id.* at 163.

VDEQ then argues (at 8) that Plaintiffs have not "allege[d] definitively that stormwater discharges from Fort Belvoir contain PFAS." That misconstrues the Petition's allegations, misunderstands the harms that Plaintiffs are claiming, ignores several types of harms that are recognized in Article III jurisprudence, and conflates the standing requirements with a merits inquiry. The Petition alleges that Fort Belvoir is likely discharging significant levels of PFAS from its industrial stormwater outfalls; VDEQ's obligation to control PFAS through the VPDES permit is triggered, not by certainty of PFAS discharges but by the "reasonable potential" of discharges of PFAS from Fort Belvoir to cause or contribute to violations of state water quality standards, after obtaining adequate information to make this determination. *See* Pet. ¶¶ 96, 97 (citing 40 C.F.R. §§ 122.44(d)(1)(i), 122.21(e), (g)(13); 9 VAC § 25-31-220(D)(1)(a)). And it is that

"reasonable potential" of PFAS-containing discharges at levels causing state water quality violations—along with VDEQ's failure to request sufficient information from the permittee, include monitoring requirements, and/or limit PFAS discharges in Fort Belvoir's permit—that causes the harms claimed by Plaintiffs' members.

The Petition states that "[l]ocations at Fort Belvoir with high levels of PFAS contamination are in close proximity to industrial stormwater outfalls covered by the Final Permit" and that, "[a]s PFAS is known to be carried by stormwater runoff, these outfalls most likely discharge PFAS *at detectable levels*." Pet. ¶ 24. The Petition supports this assertion by noting the high levels of various PFAS found in Accotink Creek, a tributary into which Fort Belvoir's outfalls flow before entering the Potomac. *Id.* ¶ 75.

Plaintiffs' members believe—with good reason—that Fort Belvoir is discharging PFAS, and that reasonable belief diminishes their recreational and aesthetic enjoyment of downstream waters and causes them to limit the ways that they use those waters. *See* Semenov Decl., ¶ 7; Armour Decl., ¶ 7; Ng Decl., ¶ 6; Zaragoza Decl., ¶¶ 8, 10, 13. The challenged permit allows Fort Belvoir to discharge any PFAS in any amount and without monitoring its outfalls for discharges of PFAS. Furthermore, the permit itself explains why Plaintiffs are cautious about alleging that Fort Belvoir is definitely and currently releasing high levels of PFAS in its stormwater outfalls. The permit lacks monitoring requirements, which Plaintiffs allege are required to be included in the permit. Because of the lack of these monitoring requirements, VDEQ's issuance of the permit also causes Plaintiffs and their members an informational injury, as they are unable to assess the levels of risk involved with various activities and educate and inform others, as accurately as they otherwise could, about their risks of PFAS exposure. Zaragoza Decl., ¶ 16.

Next, VDEQ argues (at 8–9) that Plaintiffs' harms are not caused by VDEQ's issuance of the permit because "they are complaining that by issuing the Permit, DEQ has not fixed an existing problem." The Army makes a similar argument (at 12). In other words, Defendants seem to argue that, if VDEQ issues permits that are less protective than the law requires and that perpetuate an existing pollution problem, the harm of that perpetuation (here, increased levels of PFAS in the Potomac River and tributaries beyond what was previously present) does not confer standing. With this argument, Defendants bite off more than they can chew. If adopted into standing law, this principle would result in a vast loss of standing to bring a broad range of challenges to regulatory action. When an agency denies the beneficiaries of a regulatory program the benefits to which the law entitles them—whether by mere inaction or, as here, by an affirmative decision to maintain the status quo—federal courts have consistently held that those beneficiaries have Article III standing to pursue judicial relief. *See*, *e.g.*, *Corner Post v. Federal Reserve System Board of Governors*, 603 U.S. 799, 805–06 (2024); *Massachusetts v. Environmental Protection Agency*, 549 U.S. 497 (2007); *Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221, 230 n.4 (1986). A challenge to agency under-regulation like this one is, in fact, "a typical APA suit." *Corner Post*, 603 U.S. at 826 (Kavanaugh, J., concurring). As Justice Kavanaugh emphasized in *Corner Post*, foreclosing these challenges would "revolutionize long-settled administrative law" by "shutting the door on entire classes of everyday administrative law cases"—including, as is analogous to the instant case, challenges to "emission limits or efficiency standards . . . from unregulated parties seeking stricter limits." *Id.* at 827, 836.

As for redressability, VDEQ argues (at 9–10) that Plaintiff members' harms are not redressable by a more protective permit that results in public knowledge of the levels of PFAS being discharged by Fort Belvoir and/or decreases in those discharges. Although unclear, VDEQ

16

appears to take the position that the Court should disregard the allegations (and sworn declarations) of these individuals that they would feel less worried, eat for locally caught fish and seafood, recreate more often and with more enjoyment, and benefit from increased information about PFAS contamination in their cherished waterways, if VDEQ were to issue a permit with the protections Plaintiffs seek. VDEQ refers (at 10) to allegations about these individuals' recovered enjoyment in and plans to resume their recreational activities if a more protective permit is issued as "implausible." Similarly, VDEQ refers to accidental ingestion of river water by kayakers, paddleboarders, and swimmers as "speculative," despite several declarants' stating that this is a normal and expected occurrence when engaging in these activities. *See* Semenov Decl., ¶¶ 9, 11; Ng Decl., ¶ 11; Zaragoza Decl., ¶ 10.

Contrary to VDEQ's invitation to doubt these individuals, at the pleading stage, the Court must accept all well-pleaded allegations and averments as true unless facially implausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). VDEQ seems to question Plaintiff members' honesty about their own experiences, feelings, and future plans; however, VDEQ's skepticism does not render their statements "implausible." Furthermore, redressability does not require that Plaintiff members immediately revert to their previous activities, eating habits, and level of enjoyment in these waters upon issuance of a more protective permit. As the Fourth Circuit has explained, "To establish standing to redress an environmental injury, plaintiffs need not show that a particular defendant is the only cause of their injury, and that, therefore, absent the defendant's activities, the plaintiffs would enjoy undisturbed use of a resource." *Nat. Res. Def. Council, Inc. v. Watkins*, 954 F.2d 974, 980 (4th Cir. 1992).

For its part, the Army argues (at 12) that Plaintiffs have not satisfied the redressability prong because, in its view, it is unlikely that VDEQ will craft a permit that is sufficiently protective

to address Plaintiffs' and their members' concerns. This argument conflates the merits of the case with the showing necessary for standing. In cases involving permit challenges, the Fourth Circuit has held that, "to show redressability, [plaintiffs] need only demonstrate a "realistic possibility" that they will obtain [the] ultimate relief [they seek]." *Sierra Club v. State Water Control Bd.*, 898 F.3d 383, 401–02 (4th Cir. 2018); *see also Friends of Cap. Crescent Trail v. United States Army Corps of Eng'rs*, 453 F. Supp. 3d 804, 815 (D. Md. 2020), *aff'd*, 855 F. App'x 121 (4th Cir. 2021). Even short of obtaining all the relief sought, the Fourth Circuit has held that a realistic possibility of a partial remedy is sufficient for standing. *Id.* at 402 ("[I]f Petitioners prevailed on the merits of this petition, they would obtain at least more stringent requirements on remand."). Plaintiffs have alleged that VDEQ is required to comply with the Clean Water Act by including monitoring and effluent limitations for PFAS in any permit it issues to Fort Belvoir, Pet. ¶¶ 99–106. There is more than a "realistic possibility" that, if the Court decides this case in Plaintiffs' favor, it will order VDEQ to follow the law, and that the agency will do so upon remand.[1]

---

[1] Because Plaintiffs have adequately alleged representational standing, the Court need to determine whether they have also sufficiently alleged organizational standing. Nonetheless, Plaintiffs here respond to the Army's arguments that Plaintiffs lack organizational standing because, in the Army's view, they have not suffered a cognizable Article III injury. The Army states (at 15) that "[a]n organization suffers an injury when a policy or practice frustrates the purpose of the organization and causes it to drain its resources." The Army explains that frustration of purpose entails an impediment that was put in place by the challenged action. Plaintiffs agree this is the rule. But the Army is wrong when it argues (at 13) that VDEQ's action does not constitute an impediment. The Army focuses on both organizations' expenditures of funds for collecting water samples and advocating for a more protective permit, but it overlooks both organizations' role in educating the public and their members about the sources of PFAS contamination and risks of PFAS exposure. *See* Pet. ¶¶ 1–2, 12–16; Najouks Decl., ¶ 17. This educational purpose is impeded by VDEQ's failure to include monitoring requirements in the permit, as the organizations suffer the same informational injury as the Plaintiff members. The impediment recognized by the Supreme Court in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), was false information disseminated by the defendant, which the Court found interfered with the plaintiffs' counseling service. *FDA v. All. For Hippocratic Medicine*, 602 U.S. 367, 395 (2024) (explaining *Havens*). In *FDA*, the Supreme Court reiterated that an informational injury could confer organizational standing. *Id.* In *People for Ethical Treatment of Animals v. Tri-State Zoological Park of Western*

18

Lastly, the Army argues (at 12) that permit limitations for Fort Belvoir upon remand cannot plausibly allay Plaintiffs' concerns because Fort Belvoir is not "the only contributor of PFAS to the Potomac." The Supreme Court rejected this argument in *Massachusetts v. EPA*, 549 U.S. 497, 523–25 (2007):

> At a minimum . . . EPA's refusal to regulate [greenhouse gas emissions from new motor vehicles] "contributes" to Massachusetts' injuries. EPA nevertheless maintains that its decision not to regulate greenhouse gas emissions from new motor vehicles contributes so insignificantly to petitioners' injuries that the Agency cannot be haled into federal court to answer for them. For the same reason, EPA does not believe that any realistic possibility exists that the relief petitioners seek would mitigate global climate change and remedy their injuries. . . .
>
> But EPA overstates its case. Its argument rests on the erroneous assumption that a small incremental step, because it is incremental, can never be attacked in a federal judicial forum. Yet accepting that premise would doom most challenges to regulatory action. Agencies, like legislatures, do not generally resolve massive problems in one fell regulatory swoop.
>
> While it may be true that regulating motor-vehicle emissions will not by itself *reverse* global warming, it by no means follows that we lack jurisdiction to decide whether EPA has a duty to take steps to *slow* or *reduce* it. See also *Larson v. Valente,* 456 U.S. 228, 244, n. 15, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury").

*Id.* at 523–25 (2007) (emphasis in *Massachusetts v. EPA*).

---

*Maryland, Inc.*, for example, the Fourth Circuit found organizational standing where the defendant's conduct "created the misimpression that the [defendant's practices] were lawful and consistent with animal welfare." 843 F. App'x 493, 496 (4th Cir. 2021). Similarly, here, VDEQ's issuance of a permit which contains no mention of the threat of PFAS discharges from Fort Belvoir, is an implicit—and false—statement creating the misimpression that the public need not be concerned. That is false information that directly impedes the organizations' educational purposes and causes them to further drain their resources to counter it. Thus, the organizations have adequately alleged organizational standing at this stage of the case.

As stated previously, Plaintiffs' members understand that greater exposure to PFAS entail greater health risks, and that Fort Belvoir's discharges into the waterbodies they use increases their exposure to PFAS. *See, e.g.*, Armour Decl. ¶ 10 (explaining her worries about health risks due to her combined exposure to multiple sources of PFAS). As Mr. Zaragoza put it, "the harms [he] and [his] community have experienced will be at least somewhat alleviated because there will be less PFAS contamination in the watersheds surrounding [Fort Belvoir]. Additionally, monitoring requirements will provide [him] and other community members with better information about [their] level of risk exposure when using these waters." Zaragoza Decl. ¶ 16.

In sum, Plaintiffs have adequately alleged the three elements of Article III standing, especially for this stage of the proceeding.

## II.    If Sovereign Immunity Bars Plaintiffs' Claims from Being Heard in Federal Court, the Court Should Remand the Case to Charlottesville Circuit Court.

VDEQ asserts (at 11–12) that Virginia's sovereign immunity bars this case from being heard in federal court. Plaintiffs filed their Petition for Appeal in Charlottesville Circuit Court, as allowed by Virginia's State Water Control Law, codified at Virginia Code § 62.1-44.29, and the Virginia APA. The permittee, the United States Army, then removed the case to this Court pursuant to 28 U.S.C. §§ 1442(a) and 1446(a). ECF No. 1.

VDEQ argues first (at 11) that Virginia Code § 62.1-44.29 does not waive sovereign immunity when Plaintiffs are unable to meet Article III standing. As addressed in Section I, Plaintiffs ably meet the standard for adequately alleging Article III standing at this stage of the proceedings, so this argument is unavailing and need not be addressed separately.

VDEQ then argues (at 12) that, because the provisions of the VAPA and the Virginia Supreme Court Rules mention judicial review in Virginia circuit courts but not in federal courts, that means "the Virginia state legislature assumed that only Virginia circuit courts would hear

appeals from administrative agencies." This does not follow. The Virginia legislature provided for cases to be originally filed in Virginia circuit courts, but that does not mean it did not contemplate that such cases could and would sometimes be removed to federal court. The Virginia General Assembly was doubtless aware that federal agency and officer defendants have removal power under 28 U.S.C. § 1442(a) and that federal permittees with this power would be necessary parties to administrative permit challenge cases. *See* Va. S. Ct. R. 2A:1(c); *see also Michael E. Siska Revocable Tr. ex rel. Siska v. Milestone Dev., LLC*, 282 Va. 169, 182 (2011) (declining to hear an appeal and remanding because a necessary party had not been joined). VDEQ asserts correctly (at 12) that the Virginia Supreme Court does not have the authority to promulgate rules for non-Virginia courts, but the Army has invoked its removal power under federal law—28 U.S.C. § 1442(a)—not the Virginia Code or the Virginia Supreme Court Rules.

It is unlikely that the Virginia General Assembly wished to provide judicial review for Virginia administrative agency actions while allowing agency actions to escape judicial review when a permittee happens to be a federal agency or a citizen of another state invoking a federal court's diversity jurisdiction. That would make little sense, as it is the *state agency's* action, not the actions of the permittee, that are being challenged in cases under the VAPA. Moreover, if the Virginia General Assembly did intend that carveout, it could have done so explicitly.

Furthermore, Virginia may have waived its sovereign immunity by its "voluntary participation in the [Clean Water Act's] regulatory scheme." *Sierra Club v. State Water Control Bd.*, 64 F.4th 187, 195 (4th Cir. 2023). In *Sierra Club v. State Water Control Board*, the Fourth Circuit held that Virginia had waived its sovereign immunity against federal court review of certifications it issued to interstate gas pipelines under Section 401 of the Clean Water Act, as it was on notice that another federal statute, the Natural Gas Act, provided for judicial review of such

state agency actions in federal court. *Id.* at 195–96. The Court could apply similar reasoning here. VDEQ issues VPDES permits pursuant to authority delegated to Virginia under the Clean Water Act, *see* 33 U.S.C. § 1342(b)–(d), and Virginia's voluntary undertaking of this authority may "result[] in federal jurisdiction over the state's decisions made pursuant to that scheme," at least in cases where, as here, the state was "on notice that any action [it] took relative to the issuance, conditioning, or denial of a [permit issued under the Clean Water Act]" could be subject to federal review due to the federal procedures allowing for removal. *Id.*

The single case VDEQ cites (at 12) in support of its contention that state administrative agency actions can never be reviewed in federal court—*Fernandez v. Brich*, 2024 U.S. Dist. LEXIS 111043, *21 (E.D. Va. June 20, 2024)—does not address the VAPA at all, but rather the federal Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* The full sentence that VDEQ quotes from reads: "Thus, the APA's text does not authorize federal judicial review of actions taken by non-federal entities, such as state officials." The "APA" referred to in the quoted sentence is the federal Administrative Procedure Act. Thus, this case appears to have no relevance to the question at hand.

In any event, even if Virginia's sovereign immunity bars the case from being heard in this Court, the appropriate remedy is remand to state court, not dismissal. *See McCants v. Nat'l Collegiate Athletic Ass'n*, 251 F. Supp. 3d 952, 954 (M.D.N.C. 2017) (remanding case to state cout after state agency asserted sovereign immunity). VDEQ provides no authority suggesting this Court should dismiss this case rather than remand it if the Court credits its sovereign immunity argument. The procedure for remand is provided in 28 U.S. Code § 1447(c):

> A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a). If at any

time before final judgment it appears that the district court lacks
subject matter jurisdiction, the case shall be remanded.

In *Roach v. West Virginia Regional Jail and Correctional Facility Authority*, 74 F.3d 46, 49 (4th

Cir. 1996), the Fourth Circuit applied 28 U.S.C. § 1447(c) to hold that the district court was

required to remand the case to state court rather than dismiss it after finding the Eleventh

Amendment barred it from hearing the case. The Court noted that, although sovereign immunity

was not a jurisdictional defect, it would still apply the Supreme Court's reasoning in *International*

*Primate Protection League v. Administrators of Tulane Educational Fund,* 500 U.S. 72 (1991). *Id.*

The Fourth Circuit court explained:

> The plain language of § 1447(c) gives "no discretion to dismiss
> rather than remand an action" removed from state court over which
> the court lacks subject-matter jurisdiction. *International Primate*
> *Protection League v. Administrators of Tulane Educational Fund,*
> 500 U.S. 72, 89, 111 S.Ct. 1700, 1710, 114 L.Ed.2d 134 (1991)
> (internal quotation marks omitted). Applying the above principles,
> it is evident that the district court erred by dismissing the action
> rather than remanding. The Eleventh Amendment prevented the
> district court from exercising subject-matter jurisdiction over
> Roach's claims. Therefore, § 1447(c) required the court to remand
> the action to state court.

*Id.* Thus, it is clear that remand, rather than dismissal, is the appropriate outcome here if the Court

finds that Virginia has not waived sovereign immunity.

The Army only addresses VDEQ's sovereign immunity argument briefly (at 2):

> The Commonwealth argues that its sovereign immunity could be a
> basis upon which to dismiss this case. The United States takes no
> position on Virginia's argument insofar as it applies to Plaintiffs'
> suit against the Commonwealth. The United States does not agree,
> however, that state laws can limit the United States' access to federal
> courts.

In this case, it would the Eleventh Amendment to the United States Constitution that blocked the

Army's removal, rather than state laws. The Army waived its sovereign immunity in administrative

23

challenges to permit appeals under the VAPA when it voluntarily applied for and secured a VPDES permit from VDEQ. *See* 33 U.S. Code § 1323(a). So, to be sure, Charlottesville Circuit Court has jurisdiction over all the parties; but, regardless, this Court need not make that determination if it determines that Virginia has not waived its sovereign immunity because, as the Fourth Circuit explained in *Roach*, remand is required even when futile. *Roach*, 74 F.3d at 49 (4th Cir. 1996) ("[T]he futility of a remand to West Virginia state court does not provide an exception to the plain meaning of § 1447(c)."). Accordingly, if the Court determines that Virginia is immune from suit in this Court, it should remand the case back to Charlottesville Circuit Court.

## CONCLUSION

For the foregoing reasons, Plaintiffs ask the Court to deny VDEQ's Motion to Dismiss.

Dated: April 1, 2026                    Respectfully submitted,

                                        s/*Claire Horan*
                                        Claire Marie Horan (VSB No. 95386)
                                        APPALACHIAN MOUNTAIN ADVOCATES
                                        P.O. Box 403
                                        Charlottesville, Virginia 22902
                                        choran@appalmad.org
                                        (907) 687-8561

                                        *Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

**WILD VIRGINIA and POTOMAC
RIVERKEEPER NETWORK,**

      **Plaintiffs,**

      **v.**                               **CIVIL ACTION NO. 3:25-cv-0100**

**VIRGINIA DEPARTMENT OF
ENVIRONMENTAL QUALITY,
MICHAEL ROLBAND, in his official
capacity as Director of Virginia
Department of Environmental Quality,
and UNITED STATES DEPARTMENT
OF THE ARMY, U.S. ARMY
GARRISON – FORT BELVOIR,**

      **Defendants.**

## CERTIFICATE OF SERVICE

I, Claire Marie Horan, do hereby certify that on April 1, 2026, I electronically filed the

foregoing document with the Clerk of the Court using the CM/ECF filing system.

                                        s/*Claire Horan*
                                        Claire Marie Horan (VSB No. 95386)
                                        APPALACHIAN MOUNTAIN ADVOCATES
                                        P.O. Box 403
                                        Charlottesville, Virginia 22902
                                        choran@appalmad.org
                                        (907) 687-8561

                                        *Counsel for Plaintiffs*