IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

WILD VIRGINIA and POTOMAC
RIVERKEEPER NETWORK,

        Plaintiffs,

        v.                                   **CIVIL ACTION NO. 3:25-cv-0100**

VIRGINIA DEPARTMENT OF
ENVIRONMENTAL QUALITY,
MICHAEL ROLBAND, in his official
capacity as Director of Virginia
Department of Environmental Quality,
and UNITED STATES DEPARTMENT
OF THE ARMY, U.S. ARMY
GARRISON – FORT BELVOIR,

        Defendants.

### PLAINTIFFS' RESPONSE TO THE
### UNITED STATES'S SECOND MOTION TO DISMISS

Plaintiffs Wild Virginia and Potomac Riverkeeper Network hereby respond to the United

States's (or, the "Army") Second Motion to Dismiss for Lack of Subject-Matter Jurisdiction

pursuant to Federal Rule of Civil Procedure 12(b)(1) (ECF No. 24) (the "Motion"). The Army's

Brief in Support (ECF No. 25) asserts that *any* agency, department, or instrumentality of the federal

government has sovereign immunity from being haled into *any* court—federal or state—in *any*

Clean Water Act permit challenge in which the United States is the permittee.[1] Such a rule runs

counter to the plain language of and Congressional intent in passing the Federal Facilities

Provision, 33 U.S.C. § 1323(a), and would vastly hamper citizens' ability to hold administrative

---

[1] Within this Response, page references to the Army's arguments refer to the Army's June 10, 2026 Brief in Support of its Second Motion to Dismiss (ECF No. 25), unless otherwise stated.

agencies accountable for issuing permits that fully comply with the federal Clean Water Act and the federal and state regulations that implement it. The Army first indicated that it planned to raise an additional sovereign immunity argument on April 17, 2026, then filed its Motion nearly two months later. Despite that seemingly adequate stretch of time to research the issue, the Army has not cited *any* cases in support of its purported rule. That is because there is no such rule.

To the contrary, the plain language of the Federal Facilities Provision broadly waives the sovereign immunity of any "department, agency, or instrumentality" of the federal government as to "any process" related to the "control and abatement of water pollution" that "may result" from that agency's activity, whether the process is held "in Federal, state, or local courts or in any other manner." 33 U.S.C. § 1323(a); *see generally Dep't of Energy v. Ohio*, 503 U.S. 607 (1992) (recognizing that 33 U.S.C. § 1323(a) contains a waiver of sovereign immunity). This waiver, as applied to this case, meets the legal standard cited by the Army (at 6)—it is "unequivocal" and lacks any exception that would apply to Plaintiffs' claims under the Virginia Administrative Process Act ("VAPA" or "Virginia APA"), Va. Code § 2.2-4000 *et seq. See Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005); *see also FAA v. Cooper*, 566 U.S. 284, 291 (2012) ("What we thus require is that the scope of Congress' waiver be clearly discernable from the statutory text in light of traditional interpretive tools.").[2]

---

[2] The Army cites (at 6) the Clean Water Act's Citizen Suit Provision, 33 U.S.C. § 1365(a). The Citizen Suit Provision allows citizens to sue dischargers of pollutants—including agencies of the federal government—when they lack a permit to do so. This suit does not rely on the sovereign immunity waiver in the Citizen Suit Provision because this is a challenge to the lawfulness of the NPDES industrial stormwater permit that the Virginia Department of Environmental Quality ("VDEQ") issued to the Army on October 1, 2025, to allow it to discharge pollutants into Virginia waters. The issuance of a permit allowing such activity generally acts as a "permit shield," such that citizens' main recourse is to challenge the permit that allows the polluting discharges rather than bring a citizen suit against the polluter. *See* 33 U.S.C. § 1342(k); *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., MD*, 268 F.3d 255, 269 (4th Cir. 2001). The Army's sovereign immunity argument would ignore the complementary nature of the sovereign immunity waivers

Furthermore, establishing the Army's preferred rule would, contrary to the Army's assertion (at 9), frustrate the purpose of the Federal Facilities Provision and undermine the Clean Water Act in any state which, like Virginia, makes permittees a necessary party to permit challenges.

For these reasons, the Court should deny the Army's Second Motion to Dismiss.

## BACKGROUND

For at least the past four years, the Army, Virginia Department of Environmental Quality ("VDEQ"), and the public have known that the soil, surface water, and groundwater at Fort Belvoir is contaminated with high levels of per- and polyfluoroalkyl substances ("PFAS"). Pet. ¶ 60. A 2022 Army study revealed that high levels of three types of PFAS—perfluorooctane sulfonate (PFOS), perfluorooctanoic acid (PFOA), and perfluorobutanesulfonic acid (PFBS). *Id.* ¶ 65. PFAS have a number of properties that make them particularly dangerous pollutants. They are commonly referred to as "forever chemicals" because they "do not break down or degrade over time and are therefore highly persistent." *Ctr. For Env't Health v. Regan*, 103 F.4th 1027, 1031 (4th Cir. 2024) (internal quotation marks omitted); *see also* Pet. ¶ 61. They can travel long distances in both surface water and groundwater. *Id.* ¶ 71. They bioaccumulate, becoming more concentrated in organisms higher up in the food chain, including humans. *Id.* ¶ 64.

And PFAS are known to cause a variety of serious human health impacts at even very low concentrations, including reproductive effects; developmental effects or delays in infants, children, and adolescents; increased risk of prostate, kidney, and testicular cancers; reduced immune

---

in the Federal Facilities Provision and the Citizen Suit Provision, and leave citizens without any recourse at all against polluting activity that violates the Clean Water Act.

function; interference with hormone function; increased cholesterol levels; and increased risk of obesity. *Id.* The U.S. Environmental Protection Agency ("EPA") has determined that PFOS and PFOA are likely carcinogens, which are harmful to humans at any level of exposure. *Id.* ¶¶ 64, 72.

Fort Belvoir discharges stormwater from outfalls that flow directly into unnamed tributaries to Accotink Creek and Accotink Bay, Dogue Creek, Mason Run, and Dunston Bay. *Id.* ¶ 69. From there, the discharges flow into Pohick Bay, Gunston Cove, and the Potomac River. *Id.* ¶ 70. While VDEQ was reviewing Fort Belvoir's application to renew its permit under the National Pollutant Discharge Elimination System ("NPDES") program to allow these discharges, VDEQ was in possession of sampling data collected from Accotink Creek showing high concentrations of PFOS, PFOA, PFBS, and a variety of other PFAS. *Id.* ¶ 75. Public comments submitted by Plaintiffs on VDEQ's draft permit emphasized the proximity of the outfalls covered by the permit to areas at Fort Belvoir with documented PFAS contamination. *Id.* ¶ 82. Public commenters, including Plaintiffs, urged VDEQ to include monitoring requirements and effluent limitations for PFAS, among other things, in Fort Belvoir's final permit. *Id.* Despite the abundant evidence in VDEQ's possession that Fort Belvoir's stormwater discharges likely contained PFAS at high levels and despite the public's entreaties, VDEQ declined to address PFAS at all in the permit, which it issued on October 1, 2025. *Id.* ¶¶ 88–89.

Plaintiffs filed this action in Charlottesville City Circuit Court on December 1, 2025. Plaintiffs included Fort Belvoir, the permittee, as a required party under the Virginia APA and the Rules of the Supreme Court of Virginia. *See* Virginia § 2.2-4026(A); Va. Sup. Ct. R. 2A:1(c). The Army removed the case to this Court on December 19, 2025. Since then—for over six months—the case has been mired in VDEQ and the Army's jurisdictional arguments, delaying resolution on the merits. If the Court rules in Plaintiffs' favor on the merits, Fort Belvoir will be required, through

its NPDES permit, to limit discharges of PFAS into the Potomac River and its tributaries to the extent necessary to comply with Virginia's water quality standards, as required by the Clean Water Act. *See* 33 U.S.C. § 1311(b)(1); 40 C.F.R. §§ 122(d)(1), 125.3; 9 VAC § 25-31-220(D)(1)(a). If the Court, however, adopts the Army's wide-sweeping sovereign immunity argument, Plaintiffs in this case (and countless others) will be severely hampered in their ability to obtain judicial review when agencies issue unlawful permits to federal permittees.

## ARGUMENT

### I.     The Federal Facilities Provision's plain language unequivocally waives sovereign immunity in this case.

The Federal Facilities Provision of the Clean Water Act contains a broad waiver of federal entities' sovereign immunity. It begins by stating:

> Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants, and each officer, agent, or employee thereof in the performance of his official duties, shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable service charges.

33 U.S.C. § 1323(a). It applies, as relevant here, to "[e]ach department, agency, or instrumentality . . . of the Federal Government . . . engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants." *Id.* The Army does not dispute that Fort Belvoir's activities "result," or "may result, in the discharge or runoff of pollutants," and, indeed, its NPDES permit application acknowledges as much. *Id.* The Provision goes on to state that such federal entities "shall be subject to, and comply with, *all* Federal, *State*, interstate, and local *requirements*,

administrative authority, and *process* and sanctions *respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity.*" *Id.* (emphasis added); *Cent. Sierra Env't Res. Ctr. v. Stanislaus Nat'l Forest*, 304 F. Supp. 3d 916, 933 (E.D. Cal. 2018) (quoting *Oregon Nat. Res. Council v. U.S. Forest Serv.*, 834 F.2d 842, 849 (9th Cir. 1987)) ("The CWA requires states to develop water quality standards, 33 U.S.C. § 1313, and Section 1323 'requires all federal agencies to comply with all state requirements.'").

Here, participating in an appeal of a state administrative action issuing a permit under the Clean Water Act as a required party under § 2.2-4026(A) of the Virginia APA and Rule 2A:1(c) of the Rules of the Supreme Court of Virginia,  is a "State . . . requirement" and "process" "respecting the control and abatement of water pollution" because this is the State's process for providing judicial review of NPDES permits issued by VDEQ. 33 U.S.C. § 1323(a). Non-federal permittees are necessary parties for NPDES permit appeals in Virginia, and the Federal Facilities Provision mandates that federal entities "shall be subject to, and comply with," State requirements and process "to the same extent as any nongovernmental entity." *Id.*; *see Ctr. For Native Ecosystems v. Cables*, 509 F.3d 1310, 1332 (10th Cir. 2007) (quoting S. Rep. No. 92–414 (1971), *as reprinted in* 1972 U.S.C.C.A.N. 3668, 3734) ("Congress intended this section to ensure that federal agencies were required to 'meet all [water pollution] control requirements as if they were private citizens.'").

The Federal Facilities Provision continues, from the block quote above:

> The preceding sentence shall apply (A) to any requirement whether substantive or *procedural* (including any recordkeeping or reporting requirement, *any requirement respecting permits and any other requirement, whatsoever*), (B) *to the exercise of any Federal, State, or local administrative authority, and* (C) *to any process and sanction, whether enforced in Federal, State, or local courts or in any other manner.* This subsection shall apply notwithstanding any

> immunity of such agencies, officers, agents, or employees under any
> law or rule of law.

*Id.* (emphasis added). This permit appeal fits into several of the categories listed above, for which the Federal Facilities Provision states that federal entities must comply "notwithstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law." *Id.* The VAPA and Virginia Supreme Court rule that together make permittees required parties to NPDES permit appeals are "procedural" requirements that certainly fall into the extremely broad category of "any requirement respecting permits and any other requirement whatsoever." 33 U.S.C. § 1323(a). The VAPA provision and Virginia Supreme Court rule are also "exercises of . . . State . . . authority" to which the Federal Facilities Provision makes federal agencies subject to "notwithstanding" sovereign immunity. *Id.* And, again, this permit appeal is a "process" for which sovereign immunity is waived whether this process takes place in federal or state court (or, as in some states, in an administrative court before reaching state court). *Id.* It is hard to imagine a broader waiver of sovereign immunity, as it encompasses "any" federal, state, local, or administrative" "process . . . respecting the control and abatement of water pollution," regardless of venue. *Id.* In construing the term "process" in the Federal Facilities Provision, the U.S. Supreme Court has explained that "'process' normally refers to the procedure and mechanics of adjudication and the enforcement of decrees or orders that the adjudicatory process finally provides." *U.S. Dep't of Energy*, 503 U.S. at 623. This permit appeal fits easily within the Supreme Court's broad definition of the word "process" as used in the Federal Facilities Provision. As shown in the close textual analysis offered above, the waiver unequivocally and unambiguously applies to federal permittees' participation in NPDES permit appeals.

In contrast to the above textual analysis, the Army's brief avoids a close reading of the Federal Facilities Provision. Instead, the Army presents a few different rules for application of the

waiver, each of which is completely disconnected from the Provision's text and unsupported by any other authority. First, the Army argues (at 7) that "[t]he Federal Facilities Provision does not waive the federal government's sovereign immunity in this case because there is no allegation here that the federal government failed to comply with a federal, state, or local requirement respecting the control and abatement of water pollution."[3] As shown above, the Provision does not include any reference to the allegations that must be made in a process to which the waiver would otherwise apply. Second, the Army asserts (at 8) that the sovereign immunity waiver does not apply here because "Plaintiffs make no direct claims against the federal government at all." But the Provision's text does not limit the waiver to permit-related processes in which "direct claims"—or any type of claims, for that matter—are made against the government. Furthermore, the Army focuses on the text's mandate that the federal entity must "comply" while ignoring the potentially broader "subject to" language. Finally, in yet another statement of its proposed rule, the Army asserts (at 9) that "[t]he *Federal Facilities Provision* does not make the United States amenable to suit where Plaintiffs have neither alleged any claims against, nor sought any remedy from, the United States." But, again, the Federal Facilities Provision includes neither the word "claims" nor "remedy," nor any synonym of either.

Moreover, the Army does not address, at all, the Provision's mandate that federal entities must "be subject to, and comply with" water pollution control and abatement requirements and

---

[3] Actually, Plaintiffs *do* allege that the government's activity does not comply with federal and state requirements under the Clean Water Act and its implementing regulations. As the Army acknowledges (at 8), Plaintiffs allege that VDEQ's permit was legally required to include monitoring requirements and effluent limitations. Although the Clean Water Act's permit shield may prevent Plaintiffs from bringing claims against Fort Belvoir for its PFAS discharges, *see supra* n.2, an unlawful permit does not render the Army's activities compliant with the Clean Water Act. Plaintiffs did bring this case seeking relief that would bring Fort Belvoir into compliance with the Clean Water Act's requirements.

process "in the same manner, and to the same extent as any nongovernmental entity," even though the Army's rule would result in a lack of judicial review for Virginia NPDES permits issued to federal entities while nongovernmental entities' NPDES permits would still be subject to judicial review under the Virginia APA. The Army's narrow interpretation of the Federal Facilities Provision's sovereign immunity waiver lacks any basis in the statutory text or case law.

    II.    **The history of the Federal Facilities Provision supports the waiver's application in this case.**

The Northern District of Illinois court in *Metropolitan Sanitary District of Greater Chicago v. U.S. Department of the Navy*, 722 F. Supp. 1565 (N.D. Ill. 1989), *on reconsideration in part sub nom. Metro. Sanitary Dist. of Greater Chicago v. United States*, 737 F. Supp. 51 (N.D. Ill. 1990), provided a helpful recitation of the history of the Federal Facilities Provision, and how that history informs its interpretation:

> The legislative history of § 1323(a) further supports the conclusion that Congress intended the language of the section's first sentence to serve as a blanket waiver of sovereign immunity that would include a state's entire scheme for enforcing water pollution regulations, including civil penalties. The current wording of § 1323(a) became law in the 1977 Amendments to the Clean Water Act. Congress amended the Clean Water Act, as well as the Clean Air Act and the Safe Drinking Water Act, in response to the Supreme Court's decisions in *Hancock v. Train,* 426 U.S. 167, 96 S. Ct. 2006, 48 L.Ed.2d 555 (1976) and *EPA v. California,* 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976). In these cases the Court considered the extent to which federal facilities were subject to state control under the then current language of the Clean Air Act and the Federal Water Pollution Control Act (now the Clean Water Act). Both statutes simply bound federal facilities to comply with "all Federal, State, and local requirements" regarding air and water pollution to the same extent as private entities. The Court held that this language required federal facilities to comply with the substantive requirements of state law, such as specific limits on discharges of pollutants, but did not require federal facilities to comply with state regulations that required operating permits. The Court distinguished between the substantive requirements of state law, to which federal facilities were clearly subject, and procedural

requirements of state law, which in the Court's view did not bind federal facilities under the language of the applicable statutes. The Court distinguished the substantive requirements of state law from the mechanisms that states employed to enforce those substantive requirements. Given that Congress established for federal facilities the duty to comply with state emission standards, the Court asked whether Congress also intended that states could employ the enforcement mechanisms of their federally-approved pollution control plans. *Hancock,* 426 U.S. at 183, 96 S.Ct. at 2014. The Court characterized the issue as "whether a State may enforce its emission limitations against a federal installation." *Id.* at 184 n. 44, 96 S.Ct. at 2015 n. 44. Although the Court answered that question in the negative, the *Hancock* opinion suggested that Congress could produce a different result by merely rewriting the statute with the stipulation that federal facilities would be subject to *all* requirements of state pollution laws. 426 U.S. at 182, 96 S.Ct. at 20.

Congress rewrote several pollution statutes the following year. The 1977 Amendments, which share similar wording, were intended to reverse the outcome of the Supreme Court's 1976 holding that states were powerless to enforce their pollution laws against federal facilities. As the Supreme Court suggested, Congress specified that federal facilities must comply with *all* requirements regarding pollution control. Congress also added a clarifying sentence, now the second sentence of § 1323(a), explaining that "all" requirements includes substantive, procedural, "and any other requirement whatsoever." In addition, the 1977 Amendments expressly subject federal facilities not only to state administrative authority but also to state process and state sanctions. The clarifying sentence in § 1323(a) adds that the statute applies to "any" process and sanction. With the third sentence in the amended version of § 1323(a) Congress reiterated that no claim of any immunity, including sovereign immunity, should interfere with the application of pollution laws to federal facilities. In the legislative history to the Clean Water Act Amendments of 1977, the Senate Environment and Public Works Committee wrote that the amended version of § 1323(a) "indicate[s] unequivocally that all Federal facilities and activities are subject to all of the provisions of State and local pollution laws." S.Rep. No. 95–370, 95th Cong., 1st Sess. 67, *reprinted in* 1977 U.S.Code Cong. & Admin. News 4326, 4392.

*Id.* at 1569–71. The *Metropolitan Sanitary District* court reasoned that the 1977 Amendments

ensured that the Federal Facilities Provision acts as a "blanket waiver of sovereign immunity that

would include a state's entire scheme for enforcing water pollution regulations."

A state's scheme for enforcing water pollution regulations includes its mechanisms for judicial review of allegedly unlawful permits issued as part of its water pollution control and abatement programs.

The Massachusetts Department of Environmental Protection reached a similar conclusion about the purpose of the 1977 Amendments in an appeal from an administrative order:

> The federal agencies have produced no reason to believe that Congress did not intend to allow states to enforce their own administrative requirements through their own administrative processes. On the contrary, the legislative history of the amendment of sec. 313 shows that it was precisely intended to allow states to enforce their own procedural requirements. *Metropolitan Sanitary District*, 722 F. Supp. at 1571; S. Rep. 370, 1977 U.S. Code Cong. & Admin. News at 4392.

*In the Matter of U.S. Department of Defense, U.S. National Guard Bureau*, Docket No. 87-032, Admin. Order No. 718, 1991 WL 438120, *4 (Mass. Dept. Env. Prot. May 24, 1991). The instant case is also an example of a state's administrative requirements being carried out through its own procedural requirements. Although the Court need look no further than the plain language of the Federal Facilities Provision itself, the history of the 1977 Amendments and the case law interpreting them provide additional support for finding that the sovereign immunity waiver applies in this case.

### III. Contrary to the Army's assurances, its interpretation would frustrate the purpose of the waiver and create an unintended exception to the Clean Water Act's regulatory framework.

The Army attempts (at 9) to reassure the Court that granting its Motion "would not frustrate the purpose of the *Federal Facilities Provision*" because Fort Belvoir would still have to comply with its NPDES permit or be subject to potential enforcement actions by VDEQ and because a citizen suit could still be brought if Fort Belvoir violates its NPDES permit and VDEQ fails to take action. These are the hollowest of reassurances! Plaintiffs have brought this lawsuit because the

challenged permit contains *no* limitations, controls, or even monitoring for PFAS discharges. Plaintiffs are challenging VDEQ's permit because the permit does not include any requirements explicitly related to PFAS, such that Fort Belvoir could contend it is complying with its NPDES permit while discharging *any* PFAS *in any amount*.

Judicial review of agency actions is an essential part of a state's Clean Water Act implementation, without which courts are hindered in their ability to ensure agencies comply with both federal and state laws and regulations. The Army implies (at 4 n.6) that this case's impact may be limited to Virginia because "Counsel for the United States is unaware of any other state that has a similar requirement" that permittees be joined in administrative appeals, a quick and incomplete survey reveals that such requirements are common, sometimes modeled after Federal Rule of Civil Procedure 19(a). *See, e.g.*, Neb. Rev. Stat. Ann. § 84-917 (Nebraska); 735 Ill. Comp. Stat. 5/3-107 (Illinois); *Spanish Wells Prop. Owners Ass'n, Inc. v. Bd. of Adjustment of Town of Hilton Head Island*, 295 S.C. 67, 68–69 (1988) (South Carolina); *Centamore v. Comm'r, Dep't of Hum. Servs.*, 634 A.2d 950, 951 (Me. 1993) (citing M.R. Civ. P. 19(a); C.R.C.P. 19(a) (Colorado).

Adopting the Army's interpretation of the Federal Facilities Provision would create intended differences in how Clean Water Act regulations are applied to federal permittees based on which authority issued the permit. In states without requirements similar to Virginia's, federal permittees' permits could be challenged under that state's version of the APA. And it is well-recognized that the Federal Facilities Provision waives sovereign immunity in federal APA challenges. *See Cent. Sierra Env't Res. Ctr.*, 304 F. Supp. 3d at 935–37 (listing cases).

A judicial waiver widely understood to place federal permittees in the same position as nongovernmental entities should not be interpreted to allow permits for federal permittees' polluting activities to escape judicial review to which all other permits are subject. And it is

12

similarly unfathomable that Congress, in enacting the Federal Facilities Provision, intended its waiver of sovereign immunity to apply differently to federal permittees based only on different permitting authorities' procedural rules.

## CONCLUSION

Plaintiffs ask the Court to deny the Army's Second Motion to Dismiss, as the Clean Water Act's Federal Facilities Provision unequivocally and unambiguously waives federal agencies' sovereign immunity in administrative challenges to NPDES permits.

Dated: June 24, 2026                    Respectfully submitted,

                                        s/*Claire Horan*
                                        Claire Marie Horan (VSB No. 95386)
                                        APPALACHIAN MOUNTAIN ADVOCATES
                                        P.O. Box 403
                                        Charlottesville, Virginia 22902
                                        choran@appalmad.org
                                        (907) 687-8561

                                        *Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

WILD VIRGINIA and POTOMAC
RIVERKEEPER NETWORK,

        Plaintiffs,

        v.                                 CIVIL ACTION NO. 3:25-cv-0100

VIRGINIA DEPARTMENT OF
ENVIRONMENTAL QUALITY,
MICHAEL ROLBAND, in his official
capacity as Director of Virginia
Department of Environmental Quality,
and UNITED STATES DEPARTMENT
OF THE ARMY, U.S. ARMY
GARRISON – FORT BELVOIR,

        Defendants.

**CERTIFICATE OF SERVICE**

I, Claire Marie Horan, do hereby certify that on June 24, 2026, I electronically filed the

foregoing document with the Clerk of the Court using the CM/ECF filing system.

s/*Claire Horan*

Claire Marie Horan (VSB No. 95386)
APPALACHIAN MOUNTAIN ADVOCATES
P.O. Box 403
Charlottesville, Virginia 22902
choran@appalmad.org
(907) 687-8561

*Counsel for Plaintiffs*

14